[Cite as *State v. Jones*, 2021-Ohio-2621.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

State of Ohio                                    Court of Appeals No. E-19-065

    Appellee                                 Trial Court No. 2017 CR 0311

v.

Dashay Jones                                     **DECISION AND JUDGMENT**

    Appellant                                Decided:  July 30, 2021

* * * * *

Kevin J. Baxter, Erie County Prosecuting Attorney, and
Kristin R. Palmer, Assistant Prosecuting Attorney, for appellee.

Derek A. Farmer, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Appellant, Dashay Jones, appeals the judgment of the Erie County Court of

Common Pleas convicting him, following a jury trial, of one count of possession of

cocaine in violation of R.C. 2925.11(A) and (C)(4)(f), a felony of the first degree, with

major drug offender and forfeiture specifications, and sentencing him to 11 years in prison. For the reasons that follow, we affirm.

## I. Facts and Procedural Background

{¶ 2} On July 12, 2017, the Erie County Grand Jury returned a two-count indictment against appellant, charging him with one count of possession of cocaine in violation of R.C. 2925.11(A) and (C)(4)(f), a felony of the first degree, and one count of trafficking in cocaine in violation of R.C. 2925.03(A)(1) and (C)(4)(g), a felony of the first degree. Both counts included a major drug offender specification under R.C. 2941.1410(A), and a specification for forfeiture of $2,270 under R.C. 2941.1417(A). The charges arose from a traffic stop on January 3, 2017, during which a large amount of cocaine was allegedly discovered in appellant's vehicle.

{¶ 3} On November 15, 2017, appellant moved to suppress the evidence recovered from the traffic stop arguing, inter alia, that the initial stop was unconstitutional, and that the stop was unconstitutionally delayed while a drug canine was brought to the scene.

{¶ 4} A suppression hearing was held over the course of four days on April 19, April 26, June 11, and July 16, 2018. At the suppression hearing, Sandusky Police Detective Ron Brotherton testified that on January 3, 2017, he was conducting surveillance on a motel in Huron Township, Ohio, as part of a joint investigation with the Erie County Sheriff's Department regarding suspected drug trafficking. During the surveillance, he observed appellant arrive to the motel driving a blue Chrysler minivan.

2.

Brotherton testified that appellant was under investigation as a large-scale cocaine trafficker in and around Sandusky, Ohio.

{¶ 5} Brotherton observed appellant enter the motel with only a cell phone in hand. Brotherton contacted the motel manager, who informed him that appellant was going in the direction of a room rented by Deona Green. Brotherton learned from Detective Adam West, a member of the narcotics task force, that Green is one of appellant's top phone contacts. Green is from Lima, Ohio, and Brotherton knew that appellant had connections in Lima. Brotherton testified that he also knew that appellant was transporting and trafficking a large amount of cocaine in and around Sandusky. Approximately 15 minutes after he entered, appellant exited the motel carrying a plastic bag that appeared to be full. Appellant entered his blue van and left the area.

{¶ 6} When appellant left, Brotherton and Lieutenant Danny Lewis of the Sandusky Police Department followed him in an unmarked police car. Brotherton testified that as appellant was travelling westbound on Cleveland Road, appellant committed several traffic violations in that his vehicle went over the double yellow line, then went over the solid white roadway edge line, and again touched the solid white lane divider line near Pipe Street. Brotherton testified that Lieutenant Lewis had called for a marked unit numerous times, but did not get a response. Consequently, Brotherton initiated a traffic stop on Cleveland Road near Farwell Street. Brotherton explained that appellant's father lived right around the corner, and he did not want appellant to get home before they had a chance to initiate a stop.

3.

{¶ 7} The stop took place at 3:14 p.m. Brotherton testified that as he spoke with appellant, he observed that appellant was speaking softly and his eyes were extremely wide open. Brotherton described that it looked like appellant had seen a ghost. Brotherton also noticed that appellant was breathing at a rapid rate, his chest was rising and falling quickly, the carotid artery in his neck was beating rapidly, and his mouth appeared to become very dry. Brotherton testified that when he informed appellant of the numerous traffic violations as the reason for the stop, appellant apologized and said he was on his cell phone because his friend had just text messaged him to see if he wanted to work out.

{¶ 8} During the stop, at 3:29 p.m. the K9 unit arrived. Brotherton asked appellant for consent to search the car, which appellant denied. At 3:30 p.m., Brotherton had appellant roll up his driver's side window in preparation of having the drug canine conduct a free-air sniff. The dog alerted to the presence of narcotics, at which point Brotherton asked appellant to step out of the car at 3:32 p.m. Brotherton then searched the car. In a "Stow 'n Go" compartment between the front seats and middle row of seats, the K9 officer discovered a black Crown Royal bag. Brotherton recovered the Crown Royal bag and found that it contained four bags of suspected cocaine and crack cocaine.

{¶ 9} On the second day of the suppression hearing, the K9 officer, Sandusky Police Officer Evan Estep, testified for the state. Estep testified that he arrived on scene with his trained narcotics dog Gunner. Estep had Gunner perform a free-air sniff around the vehicle during which Gunner gave his trained passive response to the presence of

4.

narcotics. Estep then assisted in the search of the vehicle with Brotherton, and by 3:37 p.m. they had located the presence of the suspected cocaine. Estep took the Crown Royal Bag, and in front of a car mounted camera, emptied the bag onto the hood of a patrol car revealing four separate bags of suspected cocaine.

{¶ 10} Appellant began his presentation of evidence on the third day of the suppression hearing. As his first witness, appellant called Carl Douglas Klein. Klein is a local photographer and videographer, and he authenticated videos and pictures that he took of the roadway near where appellant was alleged to have committed the lane violations, and of the motel where Brotherton had been conducting surveillance.

{¶ 11} Appellant's next witness was Alejandro Minor. Minor testified that on December 19, 2017—nearly a year after appellant was stopped and the drugs were discovered in his vehicle—he was giving a ride to appellant as a courtesy service as part of his automobile repair business. Minor testified that while he was driving appellant, he was pulled over by Brotherton, who was driving an unmarked silver Chevy Tahoe. Brotherton explained that Minor had committed the traffic violation of crossing marked lanes. Minor testified that he did not commit any such violation. Minor further testified that Brotherton looked right past Minor, and focused on appellant, who was sitting in the passenger seat. Brotherton asked for consent to search the vehicle, which Minor provided. Brotherton proceeded to search the car and in so doing "made a mess." Thereafter, Brotherton ended the encounter by issuing a traffic warning to Minor. Minor

felt so upset by the encounter and by how he was treated by Brotherton that he filed a complaint with the Sandusky Police Department.

{¶ 12} Appellant then attempted to call several witnesses—out of purportedly scores of witnesses—that he claimed would have testified to numerous occasions on which Brotherton, while driving an unmarked vehicle, initiated traffic stops for marked lane violations or turn signal violations. Appellant asserted that those traffic stops were not based on actual violations, but instead were mere pretexts for Brotherton to further his drug investigations. Furthermore, appellant explained that he sought to introduce such testimony to prove that Brotherton was not telling the truth in the present case when he testified that appellant committed marked lanes violations. The state objected to appellant's presentation of those witnesses pursuant to Evid.R. 608(B), which states "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Evid. R. 609, may not be proved by extrinsic evidence." The trial court agreed, and sustained the state's objection.

{¶ 13} On the final day of the suppression hearing, appellant called Sandusky Police Lieutenant Danny Lewis as a witness. Lewis testified that on January 3, 2017, he was in Huron Township, surveilling a motel for suspected drug activity based on information from a source. While on surveillance, Lewis observed appellant arrive in a blue Chrysler minivan. Lewis testified that he recognized appellant from back when he played high school basketball and from around the town. Lewis also remembered

6.

appellant from a drug investigation that took place one or two years earlier where a large amount of cocaine was found in a gutter near appellant's residence. No one was arrested as a result of that investigation.

{¶ 14} Lewis testified that approximately 15 minutes elapsed between when appellant entered the motel and when he exited. After appellant exited the motel, Lewis and Brotherton followed him in their unmarked vehicle. Lewis testified that they were about four to five car lengths behind appellant when Lewis observed appellant's vehicle go across or touch the double yellow lines, and then touch the white lane divider line near Pipe Street.

{¶ 15} When the traffic stop was initiated, Lewis began the process of writing a written warning. Lewis testified that the unmarked car he was in did not contain a computer, so Lewis first attempted to run the vehicle's registration and appellant's driver's license over the telephone. Lewis encountered some difficulty using the telephone, so he then used the radio to obtain appellant's information. Lewis testified that while he was in the process of writing the written warning, Estep arrived and conducted the free-air sniff. It was not until after the canine unit had alerted to the presence of narcotics and the search of the vehicle had begun that Lewis completed the written warning and gave it to appellant.

{¶ 16} Appellant was the final witness to testify at the suppression hearing. Appellant testified that he did not recall touching either the yellow lines or the white line on January 3, 2017.

7.

{¶ 17} On August 20, 2018, the trial court summarily denied appellant's motion to suppress. The court provided no reasoning for its decision.

{¶ 18} On June 24, 2019, the state filed a notice of its intent to introduce Evid.R. 404(B) evidence. The state argued that it was necessary to introduce evidence of appellant's 2002 and 2003 criminal convictions for narcotics trafficking to prove appellant's knowledge, intent, and lack of mistake or accident in his possession of the drugs. Appellant filed a motion in limine to prevent the introduction of this evidence, arguing that it was not offered for an admissible purpose, but rather was being used simply to show appellant's propensity and character as a drug dealer.

{¶ 19} On September 16, 2019, appellant moved to dismiss the indictment, or alternatively to continue the start of the trial, after being informed by the state that the alleged cocaine that had been seized from appellant's vehicle had been destroyed. The trial court denied appellant's motion to dismiss, but did continue the start of the trial.

{¶ 20} The trial ultimately commenced on October 2, 2019. Prior to its start, the state dismissed the count of trafficking in cocaine. The trial then proceeded over the course of six days on the count of possession of cocaine. At the trial, the following evidence and testimony were presented.

{¶ 21} Rebecca Wang, a forensic chemist with the Drug Enforcement Administration, testified that she examined four exhibits submitted to her that were numbered 28, 29, 30, and 31. Wang testified that all four exhibits contained cocaine and

8.

were in a powder form. Exhibits 28 and 30 contained cocaine hydrochloride, and exhibits 29 and 31 contained cocaine base.

{¶ 22} Wang also testified concerning the "DEA-7" form that she received along with the drugs that were sent to the laboratory. The DEA-7 form contained remarks signed by Detective Adam West that the exhibits 28, 29, 30, and 31,

> were seized as a result of a traffic stop on Dashay Jones in Sandusky, Ohio on 01-03-2017. Detective Ronald Brotherton maintained control and custody of the above exhibits until they were turned over to TFO West on 01-06-2017. On 01-06-2017, TFO West, as witnessed by TFO Hunter, forwarded the exhibits to the DEA North Central Laboratory for analysis and safekeeping.

Notably, Wang testified that the weight of the drugs listed on the DEA-7 form matched her conclusions as to the weight of the drugs that she examined. Specifically, exhibit 28 was listed as 144.5 grams, and Wang measured it as 144.0 grams; exhibit 29 was listed as 102.1 grams, and she measured it as 100.7 grams; exhibit 30 was listed as 50.9 grams, and she measured it as 50.6 grams; and exhibit 31 was listed as 33.7 grams, and she measured it as 33.0 grams. Wang testified that the slight differences in the weights were attributable to differences in the scales, different people and practices, and other things such as humidity.

{¶ 23} The state next called Officer Evan Estep. Estep testified that he responded to the traffic stop on January 3, 2017, with his canine Gunner. Estep conducted a free-air

9.

search of the vehicle with Gunner, who alerted to the presence of narcotics. Estep then assisted in the search of the vehicle and discovered a Crown Royal bag located in a storage compartment. Estep pointed out the Crown Royal bag to Brotherton, who looked inside of it and discovered the suspected cocaine. While Brotherton was arresting appellant, Estep took the Crown Royal bag and displayed its contents in front of the dash camera on Officer Schock's patrol cruiser. As shown in the video from the dash camera, the Crown Royal bag contained four bags of suspected drugs.

{¶ 24} The next witness to testify was Detective Brotherton. Brotherton testified that on January 3, 2017, he was conducting surveillance on a known drug dealer at the Motel 6 in Huron Township, Ohio. While he was conducting surveillance, appellant arrived in a blue Chrysler minivan that Brotherton had seen appellant driving before on numerous occasions. Appellant entered the motel carrying only his cellphone. Approximately 15 minutes later, appellant exited the motel carrying a plastic grocery bag that appeared to be full.

{¶ 25} Brotherton then followed appellant in his vehicle. After observing traffic violations, Brotherton initiated a traffic stop near the Thirsty Pony on Cleveland Road in Sandusky, Ohio. Brotherton approached the vehicle and began speaking with appellant. Brotherton testified that he noticed that appellant was speaking very softly, that his eyes were wide open, that his chest was rising and falling rapidly, and that his carotid artery was pulsating. Brotherton testified that appellant stated that he was coming from work, but Brotherton knew that appellant had gotten off work a few hours earlier. Appellant

10.

then explained that he had to pay some bills, and he later stated that he picked up a Christmas gift from his mother's house, which Brotherton characterized as appellant changing his story. Brotherton explained that all of those observations were criminal indicators.

{¶ 26} Shortly thereafter, once the K9 unit indicated the presence of narcotics, Brotherton asked appellant to exit the vehicle and Brotherton began his search of the interior. Brotherton testified that Estep observed the Crown Royal bag in the storage container behind the front seats. Brotherton then retrieved the Crown Royal bag and observed the suspected narcotics inside it. Brotherton testified that the drugs had a street value of approximately $10,000. At that point, Brotherton placed appellant under arrest. A search of appellant's person revealed $2,270 in cash.

{¶ 27} In addition to the suspected drugs and cash, Brotherton also testified regarding two cell phones that were also seized during the stop. On one of the cell phones was a text message from January 2, 2017, from appellant's uncle, which stated "Quart, ball, ball!!!" Appellant replied to his uncle's message by saying "Okay." Brotherton testified that in his experience "quart" refers to one-quarter ounce of drugs, or approximately seven grams, and "ball" refers to an "8 ball" or approximately 3.5 grams of drugs.

{¶ 28} Brotherton testified that several days after the stop, on January 6, 2017, he and Detective Adam West transferred the drugs from Sandusky to Toledo where they were packaged and shipped to the DEA lab in Chicago. Detective West was involved in

11.

the transport and packaging because he was assigned as a member of the DEA Task Force. Brotherton testified that unlike the Ohio Bureau of Criminal Investigation, the DEA stores the drugs in its laboratory. Brotherton further testified on cross-examination that on January 5, 2017, he conducted a field test on the suspected drugs, which tested positive for cocaine. On September 13, 2019, Brotherton learned that the drugs had been destroyed.

{¶ 29} Finally, Brotherton authenticated recordings of three jail phone calls made by appellant on September 18, 2019, which were then played for the jury. In the calls, appellant contacted a friend, Anthony Crawford, to go to the Motel 6 and speak with the manager, J.B., regarding what she was saying to the police about the January 3, 2017 incident. Appellant referred to J.B. having said that she was going to help him, but appellant then commented that she "turned the other cheek; she did something different." In a later call, appellant stated that J.B. was "making garbage up," and that if "she was going to be on my team, be all the way on my team."

{¶ 30} J.B. testified next. J.B. testified that after January 3, 2017, appellant contacted her and offered her $1,000 to say that Brotherton was standing in the lobby on that day.

{¶ 31} The state also played for the jury a videotaped deposition of Detective Adam West because West was unavailable for the trial. West testified that on January 3, 2017, he was located in Toledo, Ohio, when Brotherton called him asking for information

12.

on Deona Green. West testified that he informed Brotherton that Green was one of the top contacts on appellant's phone.

{¶ 32} West next testified about his submission of the suspected drugs to the DEA laboratory on January 6, 2017. West stated that he prepared the DEA-7 form that corresponded with the submission of exhibits 28, 29, 30, and 31. Thereafter, on April 10, 2019, West prepared a DEA "Disposition of Evidence" form for the destruction of exhibits 1-36 in a related federal case. Appellant was not charged in the federal case, but exhibits 28, 29, 30, and 31 were part of the federal government's prosecution. Once that prosecution had been adjudicated, and any applicable appeals had been completed, West received correspondence from the prosecutor that the evidence could be destroyed. West testified that due to an oversight on his part in his effort to close his case files before he left for five months of training, he completed the form that ordered exhibits 28, 29, 30, and 31 to be destroyed, not remembering that the drugs were being held at the DEA laboratory and that they were evidence in the ongoing state prosecution of appellant. The drugs were ultimately destroyed on August 9, 2019, and notice of that fact was then sent to West.

{¶ 33} The state later called Norm Ratterman over appellant's objection. Ratterman testified that in 2001 he participated in an arrest of appellant where appellant was a passenger in a pickup truck that did not belong to him. A search of the truck revealed approximately two kilograms of cocaine in a cargo bay in the right rear section of the bed of the truck. Appellant was convicted of a crime from that incident.

13.

{¶ 34} Finally, the state recalled Brotherton over appellant's objection. Brotherton testified that on June 4, 2019, he participated in a controlled delivery and search of appellant's residence, which uncovered numerous cell phones, $1,732, a digital scale with cocaine residue on it, and approximately two kilograms of suspected heroin or fentanyl.

{¶ 35} After the state rested, appellant presented several witnesses in his defense. Appellant called Sandusky Police Chief John Orzech who testified to the police department's policies regarding the logging of evidence and the use of body cameras. Orzech also testified regarding a directive that he issued in 2015 that ordered officers not to conduct field tests of suspected heroin.

{¶ 36} Appellant also called Sandusky Police Lieutenant Danny Lewis. Lewis testified that he conducted an inventory search of the blue Chrysler minivan after the suspected drugs had been located and appellant had been arrested. During his inventory search, Lewis found a plastic bag that he believed to be the one that appellant was carrying when he left the motel. The plastic bag was located in the front passenger seat or between the seat and the console, and the bag contained clothing.

{¶ 37} Appellant then called Deonia Green. Green testified that on January 3, 2017, she gave appellant a gift of a robe and a Nautica sweatsuit, and that he would have had it in a bag.

{¶ 38} After the completion of the testimony, evidence, and closing arguments, the trial court instructed the jury. Included in those instructions, over the objection of

14.

appellant, was a provision on consciousness of guilt based upon the testimony that appellant offered to bribe one of the witnesses. Ultimately, after deliberations, the jury returned with a verdict of guilty on the sole count of possession of drugs, with additional findings that the amount of cocaine exceeded 100 grams, and that the $2,270 was subject to forfeiture.

{¶ 39} At sentencing, the trial court found that appellant was a major drug offender, and sentenced him to a mandatory 11-year prison term. The court further ordered the $2,270 to be forfeited.

## II. Assignments of Error

{¶ 40} Appellant has timely appealed his judgment of conviction, and now asserts four assignments of error for our review:

I. Mr. Jones was convicted with insufficient evidence and his conviction was against the weight of the evidence in violation of both the Fourteenth Amendment to the United States Constitution and Article I, sec. 14 of the Ohio Constitution.

II. The Trial Court errored in violation of the Fourth Amendment to the U.S. Constitution and Article I, Section 14 of the Ohio Constitution when it failed to suppress the evidence allegedly removed from the vehicle Mr. Jones was driving.

III. The Trial Court errored to the prejudice of Mr. Jones in giving a Consciousness of Guilt Jury Instruction without supporting evidence for it.

IV.  The Trial Court errored to the prejudice of Mr. Jones when it permitted the State to Submit testimony of a prior conviction and the judgment entry of that conviction in violation of the Due Process Clause of both the U.S. and Ohio Constitutions.

### III.  Analysis

{¶ 41} For ease of discussion, we will address appellant's assignments of error out of order, beginning with his second assignment of error.  Notably, appellant's second assignment of error contains two parts.  First, appellant challenges the trial court's denial of his motion to suppress.  Second, appellant argues that his right to compulsory process was violated when the trial court did not allow him to present multiple witnesses to attack the credibility of the state's witnesses.

### A.  Motion to Suppress

{¶ 42} In his second assignment of error, appellant challenges the trial court's denial of his motion to suppress, arguing that the traffic stop and subsequent search of his van were unconstitutional under the Fourth Amendment to the U.S. Constitution and Article I, Section 14 of the Ohio Constitution.

{¶ 43} Review of a trial court's grant or denial of a motion to suppress presents mixed questions of law and fact.  *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.  An appellate court defers to a trial court's factual findings made with respect to its ruling on a motion to suppress where the findings are supported by competent, credible evidence.  *Id*.; *State v. Brooks*, 75 Ohio St.3d 148, 154, 661

N.E.2d 1030 (1996). "[T]he appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Burnside* at ¶ 8, citing *State v. McNamara*, 124 Ohio App.3d 706, 710, 707 N.E.2d 539 (4th Dist.1997).

## 1. Initial Stop

{¶ 44} When an automobile is stopped and its occupant or occupants are detained, a seizure has occurred within the meaning of the Fourth Amendment of the U.S. Constitution and Article I, Section 14 of the Ohio Constitution. *State v. Bordieri*, 6th Dist. Lucas No. L-04-1321, 2005-Ohio-4727, ¶ 9. A traffic stop may be effected in one of two ways, (1) "there is probable cause to believe that the driver is violating a traffic or equipment regulation," or (2) "there is articulable and reasonable suspicion that the vehicle or its occupant is otherwise subject to seizure for violation of the law." *Id*. "Probable cause exists when a police officer has a reasonable ground for suspicion supported by facts and circumstances sufficiently strong in themselves to warrant a prudent person to believe that an accused committed or was committing an offense." *State v. Purley*, 6th Dist. Lucas No. L-11-1116, 2012-Ohio-3734, ¶ 13, citing *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). "When police stop a vehicle without either probable cause or a reasonable articulable suspicion of criminal activity, the seizure is violative of the individual's constitutional rights and evidence derived from such a stop must be suppressed." *Bordieri* at ¶ 9, citing *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

17.

{¶ 45} In this case, Brotherton testified during the suppression hearing that appellant committed a marked lanes violation when he "[went] over the double yellow line." Appellant does not contest that crossing over a double yellow line constitutes a marked lanes offense in violation of R.C. 4511.33(A)(1), which states, "A vehicle * * * shall be driven, as nearly as practicable, entirely within a single lane or line of traffic and shall not be moved from such lane or line until the driver has first ascertained that such movement can be made with safety." Instead, appellant argues that Brotherton could not have possibly viewed the offense from his vantage point.[1] Appellant challenges the credibility of Brotherton's testimony by relying on the video evidence provided by the videographer showing the general location of the alleged offenses, and by appellant's own assertion that in order to see back tires go over a line, the front tires must go over the lines to a dangerous distance.

{¶ 46} Upon review, we find that competent and credible evidence exists to support the trial court's implied factual finding that appellant's vehicle went over the double yellow line. Brotherton testified that he while he was following appellant's van, he observed the violation. Lewis also testified that he observed the violation, and that he and Brotherton were following appellant from a distance of about four to five car lengths.

---

[1] Brotherton also testified that appellant went over the white roadway edge line and touched the white lane divider line. Appellant argues that Brotherton only testified that appellant "touched" the white line or middle lane divider, and that merely touching those lines is not a violation of Ohio's marked lane statute. However, because Brotherton also testified that appellant crossed over the double yellow line, we need not address appellant's arguments.

18.

We find that four to five car lengths is a short enough distance for an officer to be able to observe a marked lanes violation. Therefore, we defer to the trial court's factual findings, and hold that the initial stop of appellant's van was constitutional because Brotherton had probable cause to believe that appellant had committed a traffic violation.

## 2. Length of the Stop

{¶ 47} Appellant next challenges the duration of the stop. "A traffic stop may last no longer than is necessary to resolve the issue that led to the original stop, absent some specific and articulable facts that further detention was reasonable." *State v. Jones*, 187 Ohio App.3d 478, 2010-Ohio-1600, 932 N.E.2d 904, ¶ 35 (6th Dist.), citing *State v. Chatton*, 11 Ohio St.3d 59, 463 N.E.2d 1237 (1984). After a stop is made, officers "may detain the motorist for a period of time sufficient to run a records check on the driver's license, registration and plates and to issue the driver a citation or warning." *Bordieri* at ¶ 20; *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 12. In determining whether an officer completed those tasks within a reasonable period of time, "the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation." *Batchili* at ¶ 12, quoting *State v. Howard*, 12th Dist. Preble Nos. CA2006-02-002, CA2006-02-003, 2006-Ohio-5656, ¶ 15.

{¶ 48} Here, the traffic stop began at 3:14 p.m. At 3:32 p.m., the K9 unit alerted to the presence of drugs, thereby giving the officers probable cause to search the vehicle. After the K9 unit alerted, Lewis completed the traffic warning and presented it to

appellant. Thus, the question we must determine is whether 18 minutes is a reasonable amount of time to conduct a traffic stop.

{¶ 49} Appellant argues that the traffic stop should have taken only three minutes because Brotherton knew appellant and had seen him driving the van in the days preceding the stop. Brotherton testified, however, that in order to run a records check, he needed specific information that he did not have, such as appellant's driver's license, vehicle registration number, and expiration date. Brotherton testified that it was Lewis who completed the paperwork for the traffic warning. Lewis, for his part, testified that he first attempted to conduct a records check over the telephone because their unmarked vehicle did not have a computer in it. Lewis then explained that he encountered some technical difficulties over the phone, and switched to completing the records check over the radio.

{¶ 50} Ultimately, Lewis testified that he was working on the traffic warning during the entirety of the stop, and we note that the record contains no evidence to show that Lewis was acting in a dilatory manner. Further, although appellant highlights that Estep testified that he spoke with Lewis for approximately two minutes before conducting the free-air sniff, the record is clear that Lewis would not have completed the traffic warning before the K9 unit alerted to the presence of drugs, because it was not until after appellant had been removed from the vehicle and the search had begun that Lewis completed the traffic warning. Thus, in light of the totality of the circumstances, we hold that Lewis diligently completed the records check and written warning, and we

20.

conclude that the 18-minute stop was not unreasonable. *Compare State v. Carlson*, 102 Ohio App.3d 585, 599, 657 N.E.2d 591 (9th Dist.1995) (19-minute stop reasonable where officer radioed information and began written warning, and upon receiving an inconclusive response from the driver's license number, diligently pursued a computer check), *with State v. Hall*, 2017-Ohio-2682, 90 N.E.3d 276, ¶ 4 (2d Dist.) (24-minute stop unreasonable where the officer "stalled" and did nothing to process the traffic stop for approximately eight minutes). Therefore, we hold that the length of the stop prior to the K9 unit's alert did not violate appellant's constitutional rights.

### 3. Probable Cause to Search the Van

{¶ 51} Having determined that the initial stop and continued detention of appellant was proper, we must now briefly address the constitutionality of the search of appellant's van. "The use of a drug dog to sniff the exterior of a vehicle, lawfully detained, is not a search within the meaning of the Fourth Amendment." *State v. Jones*, 2019-Ohio-3704, 143 N.E.3d 1170, ¶ 18 (6th Dist.), citing *Bordieri* at ¶ 22. "[W]hen a [drug] dog alerts to the presence of drugs, it gives law enforcement probable cause to search the entire vehicle." *Id.*, quoting *State v. Nguyen*, 157 Ohio App.3d 482, 2004-Ohio-2879, 811 N.E.2d 1180, ¶ 22 (6th Dist.).

{¶ 52} Here, while appellant's van was lawfully detained, the K9 unit alerted to the presence of drugs. Thus, the officers had probable cause to search appellant's vehicle, and the search was not unconstitutional.

21.

{¶ 53} Accordingly, because appellant's constitutional rights were not violated during the stop or search of his vehicle, we hold that the trial court did not err in denying appellant's motion to suppress. Appellant's second assignment of error is not well-taken as it pertains to the trial court's denial of his motion to suppress.

### B. Compulsory Process

{¶ 54} Under the umbrella of his second assignment of error, appellant also argues that his right to compulsory process as guaranteed by the Sixth Amendment to the United States Constitution and Section 10, Article 1 of the Ohio Constitution was violated when the trial court did not allow him to call multiple witnesses to challenge the credibility of Brotherton and the other state witnesses.

{¶ 55} "The Sixth Amendment to the United States Constitution and Section 10, Article 1 of the Ohio Constitution provide that a criminal defendant shall have the right to compulsory process to procure the attendance of witnesses in his favor." *State v. Denis*, 117 Ohio App.3d 442, 445, 690 N.E.2d 955 (6th Dist.1997). In *Denis* we recognized:

> "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purposes of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due

22.

process of law." [*Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).]

In so holding, the court equated the right to compulsory process with the other Sixth Amendment rights applicable to the states. *Id.* The right to compulsory process, however, is not unlimited. In *Taylor v. Illinois* (1988), 484 U.S. 400, 410-411, 108 S.Ct. 646, 654, 98 L.Ed.2d 798, 811-812, the court explained:

"The principle that undergirds the defendant's right to present exculpatory evidence is also the source of essential limitations on the right. The adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case."

Accordingly, a defendant's right to present his own witnesses to establish a defense is prescribed by the rules of evidence.

*Denis* at 445-446.

{¶ 56} Here, appellant sought to introduce scores of witnesses who he claims would have testified that Brotherton and others were lying about the circumstances of appellant's traffic stop because those witnesses had similar encounters with Brotherton in the past. However, Evid.R. 608(B) clearly prohibits this type of testimony: "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the

23.

witness's character for truthfulness, other than conviction of crime as provided in Evid.R. 609, *may not be proved by extrinsic evidence*." (Emphasis added.) The purpose of this rule is to protect "a legitimate state interest in preventing criminal trials from bogging down in matters collateral to the crime with which the defendant was charged," *State v. Boggs*, 63 Ohio St.3d 418, 422-423, 588 N.E.2d 813 (1992), and the necessity of the rule is exemplified in the present case where appellant sought to call dozens of witnesses to testify regarding Brotherton's credibility. Therefore, we hold that the right to compulsory process does not grant appellant the right to attack a witness's character for truthfulness by the use of extrinsic testimony about previous encounters with the witness.

{¶ 57} Accordingly, appellant's second assignment of error is not well-taken as it pertains to the trial court's denial of his attempt to call multiple witnesses to challenge Brotherton's character for truthfulness.

### C. Jury Instruction on Consciousness of Guilt

{¶ 58} In his third assignment of error, appellant argues that the trial court erred when it gave an instruction to the jury on consciousness of guilt.

{¶ 59} We review the trial court's decision to include a requested jury instruction for an abuse of discretion. *State v. Harper*, 2017-Ohio-1395, 89 N.E.3d 141, ¶ 48 (6th Dist.), citing *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989). An abuse of discretion connotes that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

24.

**{¶ 60}** "[A] trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus. "A jury instruction on consciousness of guilt is appropriate when the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction." *State v. Taylor*, 6th Dist. Lucas No. L-12-1037, 2013-Ohio-3066, ¶ 29.

**{¶ 61}** Here, the trial court instructed the jury,

Testimony has been admitted indicating that the Defendant attempted to bribe a witness. You are instructed that attempting to bribe a witness alone does not raise a presumption of guilt, but it may tend to indicate the Defendant's consciousness and/or awareness of guilt.

If you find the facts do not support the fact – the allegation that the Defendant attempted to bribe a witness, or if you find that some other motive prompted the Defendant's conduct, or if you are unable to decide what the Defendant's motivation was, then you should not consider this evidence for any purpose.

However, if you find that the facts support that the Defendant engaged in such conduct, and if you decide that the Defendant was motivated by a consciousness of and/or awareness of guilt, you may, but are not required to, consider the evidence in deciding whether the

Defendant is guilty of the crime charged. You alone will determine what weight, if any, to be given to this evidence.

{¶ 62} At the outset, we hold that evidence of attempted bribery of a witness is sufficient to warrant a jury instruction on consciousness of guilt. *See State v. Leu*, 2019-Ohio-3404, 142 N.E.3d 164, ¶ 39 (6th Dist.) ("Evidence of the attempted bribery of a witness by a defendant is admissible against that defendant since such an attempt demonstrates consciousness of guilt.").

{¶ 63} Appellant, however, argues that the jury instruction was not appropriate in this case because the evidence does not demonstrate that he attempted to bribe J.B. In particular, appellant argues that J.B. admitted that she had never met appellant and could not recognize his voice, and thus she acknowledged that "it could have been anybody" on the phone offering her $1,000 to lie and state that Brotherton was in the lobby of the motel. We find appellant's characterization of J.B.'s testimony to be incomplete. On cross-examination, J.B. testified that her ex-boyfriend, J.M. knew appellant. J.M. contacted J.B. at work and informed her that appellant wanted her to lie for him. J.B. then gave her cell phone number to J.M., and as soon as she did she received a call from someone who identified himself as appellant. It was the person who identified himself as appellant that offered J.B. $1,000 to lie about Brotherton. Thus, although it may be possible that the person who identified himself as appellant actually may have been someone else, we find that reasonable minds could conclude that it in fact was appellant

26.

who offered the bribe to J.B.  Therefore, we hold that the trial court did not abuse its discretion when it gave the jury instruction on consciousness of guilt.

{¶ 64} Accordingly, appellant's third assignment of error is not well-taken.

**D.  Insufficiency and Manifest Weight**

{¶ 65} In his first assignment of error, appellant argues that his conviction is based on insufficient evidence and is against the manifest weight of the evidence.

{¶ 66} Insufficiency and manifest weight are distinct legal theories.  In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.  In contrast, when reviewing a manifest weight claim,

> [t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.

*State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

27.

{¶ 67} Here, appellant was convicted of possession of drugs in violation of R.C. 2925.11(A), which provides, "No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." If the amount of the drug involved equals or exceeds 100 grams of cocaine, the offense is a felony of the first degree and the offender is a major drug offender. R.C. 2925.11(C)(4)(f).

{¶ 68} As to his claim of insufficiency, appellant argues that the evidence was insufficient to demonstrate that he knowingly possessed the drugs. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). "'Possess' or 'possession' means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). Possession may be actual or constructive. "Actual possession occurs when the defendant has the items within his immediate physical control, whereas constructive possession occurs when the defendant is able to exercise dominion and control over an item, even if the individual does not have the item within his immediate physical possession." *State v. Shelby*, 2019-Ohio-1564, 135 N.E.3d 508, ¶ 24 (6th Dist.), citing *State v. Fykes*, 6th Dist. Wood No. WD-07-072, 2009-Ohio-2926, ¶ 36. "In order for constructive possession to exist, there must be evidence demonstrating that the defendant was conscious of the presence of the object. Although a defendant's mere

28.

proximity to an item is in itself insufficient to establish constructive possession, proximity to the item may constitute some evidence of constructive possession." *Id.*, quoting *Fykes* at ¶ 36. "A court must look at all of the attendant facts and circumstances in order to determine if a defendant knowingly possessed a controlled substance." *Id.*

{¶ 69} Appellant stridently argues that the evidence is insufficient because Brotherton failed to wear his body camera in a proper manner resulting in its failure to capture video of where the drugs were discovered in the van. Appellant suggests that Brotherton's conduct with regard to the body camera was a learned behavior, and that Brotherton intentionally deprived appellant of potentially exculpatory evidence and forced appellant to rely solely on Brotherton's testimony concerning where the drugs were located. Appellant asserts that if the drugs were in a place that was not readily accessible to appellant, such a fact would suggest that the drugs were not knowingly possessed by him.[2] Appellant further argues that the fact that the van belonged to appellant's father, and not to appellant, coupled with the officers' inability to answer the questions of when the drugs were placed in the vehicle, or who placed the drugs in the vehicle, render the evidence insufficient to support the conclusion that he knowingly possessed the drugs.

{¶ 70} Upon reviewing all of the attendant facts and circumstances in a light most favorable to the prosecution, we find that the evidence was sufficient to support the jury's

---

[2] Notably, at trial, appellant intimated that perhaps Brotherton and the other officers planted the drugs in appellant's van.

29.

conclusion that appellant knowingly possessed the drugs. In this case, appellant was the sole occupant of the vehicle in which the drugs were found. Because appellant was the sole occupant, we find that his proximity to the drugs is less important because he had exclusive access to all parts of the vehicle, but we note that the drugs were found in a storage compartment behind the driver's seat.[3] Further, although appellant did not own the vehicle, Brotherton testified that he had seen appellant driving it on numerous occasions. Appellant also possessed a large amount of cash, $2,270, which former Erie County Sheriff's Deputy Justin Smith testified is often seen in drug investigations. Additionally, appellant's cell phone contained a text message from his uncle on the day before the incident, in which his uncle messaged "Quart, ball, ball!!!" and appellant replied "Okay." Brotherton testified that "quart" refers to a quarter-ounce of drugs, and "ball" refers to an "8-ball," or one-eighth of an ounce, with the obvious implication that appellant's uncle was ordering a certain amount of drugs. Finally, J.B. testified that appellant tried to bribe her, thereby demonstrating his consciousness of guilt. From this evidence, we find that a rational trier of fact could have found beyond a reasonable doubt that appellant knowingly possessed the drugs found in the van. *See State v. Davis*, 2018-Ohio-4368, 121 N.E.3d 864, ¶ 52 (3d Dist.) (evidence sufficient to establish defendant

---

[3] To the extent that appellant suggests that the drugs were not where Brotherton claimed they were, appellant's argument is an attack on Brotherton's credibility. In our sufficiency analysis, we must view the evidence in the light most favorable to the prosecution, and thus assume that Brotherton's testimony is credible. *See State v. Goff*, 82 Ohio St.3d 123, 139, 694 N.E.2d 916 (1998) ("[I]n a review of the sufficiency of the evidence, the court does not engage in a determination of the witnesses' credibility.").

30.

knowingly possessed drugs where appellant was only person in the vehicle, the drugs were located on the driver's side floorboard and the center console, and appellant made furtive movements in the area where the drugs were found). Therefore, we hold that appellant's conviction is not based upon insufficient evidence.

{¶ 71} Appellant alternatively argues that his conviction is against the manifest weight of the evidence. In support, appellant argues that the drugs submitted to the DEA laboratory did not come from his van. First, appellant relies on the lack of body camera footage of the location of the drugs in the van. Next, appellant points to an apparent discrepancy between the officers' description of the drugs as crack cocaine, a crystalline material, and Wang's testimony that the drugs she tested were in powder form. Appellant also cites the state's failure to produce the evidence sign-out sheets, which would have shown who accessed the drugs; in particular, Brotherton's access to test the drugs on January 5, 2017, before they were submitted to the DEA laboratory. Appellant also argues that a photograph of the drugs taken by Brotherton on January 5, 2017, only shows two bags, one of which contains a crystalline material. Finally, appellant highlights that the drugs were destroyed, rendering it impossible to verify that the drugs tested were from the van.

{¶ 72} Reviewing the matter for manifest weight, we are not persuaded by appellant's argument, which predominantly relies on a lack of evidence, rather than on the evidence presented. To believe appellant's argument, we must believe that Brotherton, Lewis, West, and others, either (1) planted the drugs in appellant's vehicle, or

(2) switched the four baggies of unknown material from appellant's vehicle with actual drugs, submitted the actual drugs to the DEA laboratory for testing, and then ordered the drugs to be destroyed so that they could not be compared to what was actually found in the van. We find that both theories are easily disproven by the fact that the K9 unit positively alerted to the presence of drugs before any of the officers entered appellant's van, which leads to the conclusion that the drugs were in the van at the time of the initial stop. Furthermore, we find the dashcam videos of the recovery of four baggies of material, the testimony of Brotherton, Lewis, and West as to the chain of custody of those baggies of material and their ultimate submission to the DEA laboratory, and the laboratory's findings regarding the presence and quantity of drugs in those baggies to be credible evidence that the baggies recovered from the van were, in fact, drugs. This conclusion is further supported by appellant's possession of $2,270 in cash, the apparent drug trafficking message on his cell phone, and his attempt to bribe J.B. Therefore, we find that this is not the exceptional case where the jury clearly lost its way and the evidence weighs heavily against the conviction, and we hold that appellant's conviction is not against the manifest weight of the evidence.

{¶ 73} Accordingly, because appellant's conviction is not based upon insufficient evidence, nor is it against the manifest weight of the evidence, appellant's first assignment of error is not well-taken.

## E. Other Acts Evidence

{¶ 74} Finally, in his fourth assignment of error, appellant argues that the trial court erred when it allowed the state to present evidence of his 2001 arrest for drug possession.

{¶ 75} Evid.R. 404(B) provides that "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." "When considering whether to allow Evid.R. 404(B) evidence, a trial court should consider (1) whether the evidence is relevant, (2) whether the evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B), and (3) whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice." *State v. Heiney*, 2018-Ohio-3408, 117 N.E.3d 1034, ¶ 56 (6th Dist.), citing *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20.

{¶ 76} Our analysis will focus on the second prong identified in *Williams*, namely whether the evidence was presented for a legitimate purpose. The admissibility of other-acts evidence pursuant to Evid.R. 404(B) as it pertains to whether the evidence is presented for a legitimate purpose is a question of law. *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22.

{¶ 77} In *Hartman*, the Ohio Supreme Court provided guidance for addressing other acts evidence:

33.

Courts have long struggled with differentiating between the two types of evidence. This is in large part because "other-act evidence is usually capable of being used for multiple purposes, one of which is propensity." *United States v. Gomez*, 763 F.3d 845, 855 (7th Cir.2014) (en banc) (applying Fed.R.Evid. 404(b), which is substantively analogous to Ohio's Evid.R. 404(B)). For that reason, it is "not enough for the proponent of the other-act evidence simply to point to a purpose in the 'permitted' list and assert that the other-act evidence is relevant to it." *Id.* at 856. The rule is concerned not only with the ultimate justification for admitting the evidence but also "with the chain of reasoning that supports the non-propensity purpose for admitting the evidence." *Id.* To properly apply the rule, then, courts must scrutinize the proponent's logic to determine exactly how the evidence connects to a proper purpose without relying on any intermediate improper-character inferences. *Id.*

*Hartman* at ¶ 23.

{¶ 78} In this case, in seeking to admit evidence of appellant's 2001 drug arrest where drugs were found in a cargo bay in the bed of a pickup truck—as well as the 2019 controlled delivery to appellant's residence—the state argued that the evidence was for the purpose of establishing appellant's knowledge that the drugs were in the van, i.e., that

he *knowingly* possessed the drugs.[4]  In its brief, the state attempts to assert that the other acts evidence established appellant's knowledge, but in so doing makes the propensity argument that is the reason for the rule in Evid.R. 404(B).  Specifically, the state argues, "By demonstrating that this incident represented just part of Appellant's long-running pattern of narcotics activity, the State was able to show that Appellant knowingly possessed drugs under similar circumstances."  Essentially, the state's logic is that because appellant is a drug dealer, he must have known that the drugs were in the van.  However, aside from appellant's propensity to be involved in drug activity, the 2001 drug arrest and the 2019 controlled delivery have no bearing on whether appellant had knowledge that the drugs were in the storage compartment of the van on January 3, 2017; the evidence of those other acts does not show that appellant had knowledge that the specific drugs existed, or that appellant placed those drugs in the van.  Therefore, because the evidence in this case was not offered for a legitimate purpose, but rather was offered to show appellant's propensity to commit drug crimes, we hold that the trial court's decision to admit that evidence was in error.

{¶ 79} Nevertheless, we find that the trial court's error was harmless.  Crim.R. 52(A) provides, "Any error, defect, irregularity, or variance which does not affect

---

[4] In the trial court, and on appeal, the state more broadly asserts that the evidence was admitted to prove appellant's identity, knowledge, intent, and absence of mistake or accident.  We focus on the "knowledge" exception because appellant's identity was not in doubt, his intent in possessing the drugs was irrelevant because the trafficking charge was dismissed, and there was no indication that the drugs were mistakenly or accidentally in the van.

substantial rights shall be disregarded." "Under Crim.R. 52, in order to prejudice a defendant's substantial rights, the error 'must have affected the outcome of the [trial] court proceedings.'" (Brackets sic.) *State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, 153 N.E.3d 44, ¶ 62, quoting *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 7.

{¶ 80} The Ohio Supreme Court has identified a three-part analysis to determine "whether the erroneous admission of certain evidence affected the defendant's substantial rights so as to require a new trial or whether the admission of that evidence was harmless error under Crim.R. 52(A)." *Id*. at ¶ 63.

> First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. * * * Second, it must be determined whether the error was not harmless beyond a reasonable doubt. * * * Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt.

(Internal citations omitted). *Id.*, quoting *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37.

{¶ 81} Here, we find that the evidence of appellant's other acts tends to influence a factfinder to believe appellant is guilty of drug possession in this case. However, when that evidence is excised, we find that the remaining evidence still establishes appellant's guilt beyond a reasonable doubt. As discussed in appellant's first assignment of error,

36.

appellant was the sole occupant of a vehicle that he had been seen driving on multiple occasions. Hidden inside of a storage compartment in the vehicle were four bags of cocaine, valued at approximately $10,000. For appellant to be truly ignorant of the presence of the drugs, one would have to conclude that the true owner allowed appellant to drive the van around town with $10,000 of his or her illegal drugs inside, thereby exposing the drugs to discovery, seizure, or destruction. We find this conclusion unreasonable. More importantly, the presence of large amounts of cash on appellant's person, the text message exchange with his uncle regarding drug quantities, and his attempt to bribe J.B., corroborate the conclusion that appellant knowingly possessed the drugs in the van. Therefore, we hold that the remaining evidence overwhelmingly demonstrates that appellant committed the offense of drug possession, and the inclusion of the other acts evidence was harmless beyond a reasonable doubt.

{¶ 82} Accordingly, appellant's fourth assignment of error is not well-taken.

### IV. Conclusion

{¶ 83} For the foregoing reasons, we find that substantial justice has been done the party complaining, and the judgment of the Erie County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

37.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark. L. Pietrykowski, J.

_____
JUDGE

Gene A. Zmuda, P.J.

_____
JUDGE

Myron C. Duhart, J.
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.