[Cite as *State v. Lebron-Novas*, 2025-Ohio-1101.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

State of Ohio                                          Court of Appeals No.  E-23-025

    Appellee                                      Trial Court No.  2021 CR 0012

v.

Elmer Lebron-Novas                         **DECISION AND JUDGMENT**

    Appellant                                     Decided:  March 28, 2025

\* \* \* \* \*

Kevin J. Baxter, Erie County Prosecuting Attorney,
and Kristin R. Palmer, Assistant Prosecuting Attorney,
for appellee.

J. Gerald Ingram and Corey J. Grimm, for appellant.

\* \* \* \* \*

**ZMUDA, J.**

# I.  Introduction

{¶ 1} Appellant, Elmer Lebron-Novas, appeals the February 17, 2022 judgment of the Erie County Court of Common Pleas denying his motion to suppress evidence.  For the following reasons, we reverse the trial court's judgment.

## A. Facts and Procedural Background

{¶ 2} On January 14, 2021, appellant was indicted on one count of trafficking in cocaine in violation of R.C. 2925.03(A)(2) and (C)(4)(g), a first degree felony; one count of possession of cocaine in violation of R.C 2925.11(A) and (C)(4)(f), a first degree felony; one count of trafficking in a fentanyl-related compound in violation of R.C. 2925.03(A)(2) and (C)(9)(h), a first degree felony; one count of possession of a fentanyl-related compound in violation of R.C. 2925.11(A) and (C)(11)(g), a first degree felony; one count of trafficking in drugs (tramadol) in violation of R.C. 2925.03(A)(2) and (c)(2)(c), a fourth degree felony; one count of possession of drugs (tramadol) in violation of R.C. 2925.11(A) and (C)(2)(b), a fourth degree felony; and one count of receiving stolen property in violation of R.C. 2913.51(A) and (C), a fourth degree felony. Each of the first four counts included a related specification that appellant was a major drug offender pursuant to R.C. 2641.1410(A). The charges arose from a July 9, 2020 incident in which appellant was pulled over by an Ohio State Highway Patrol trooper for following the vehicle in front of him too closely. During the stop, the trooper conducted a search of the vehicle and discovered a compound that was ultimately determined to contain cocaine, fentanyl, and Tramadol.

{¶ 3} Appellant appeared for his arraignment on March 10, 2021, and entered a not guilty plea to all counts. At that time, he was determined to be indigent and was appointed counsel. Relevant to the present appeal, the state provided appellant with a

2.

copy of the dash camera video of the trooper's initiation of the traffic stop shortly after his arraignment.

{¶ 4} On May 5, 2021, appellant filed a motion to suppress evidence in advance of trial. In his motion, he argued that the stop was unconstitutional because the trooper had no probable cause to pull him over.[1] Due to the violations of his constitutional rights, appellant argued that the evidence against him was improperly seized and could not be introduced at trial. The state did not offer a written response prior to the June 9, 2021 hearing.

{¶ 5} The hearing on appellant's motion to suppress took place over two days on June 29, 2021, and January 21, 2022. Trooper Colt Browne and Trooper Kyle Mayle testified at the hearing. Trooper Browne's testimony focused primarily on his observation of appellant's driving and his decision to initiate a traffic stop. Trooper Mayle testified primarily as to his use of a K9 to detect drugs in the vehicle after arriving at the stop. We resolve this appeal on appellant's fifth assignment of error, alleging that because Trooper Browne had no probable cause to initiate a traffic stop that the trial court erred in denying his motion to suppress any evidence seized during that stop. Because only Trooper Browne offered testimony relevant to our review of the propriety of that initial traffic stop, we omit a summary of Trooper Mayle's testimony.

---

[1] Appellant's motion also alleged that Trooper Browne unreasonably extended the traffic stop to allow for a trooper to conduct a K9 search and that the troopers engaged in racial profiling. We resolve this appeal on appellant's first argument and, therefore, do not address these additional grounds.

3.

**Testimony of Trooper Colt Browne**

{¶ 6} At the time of his testimony, Trooper Colt Browne had been employed with the Ohio State Highway Patrol for approximately ten years. He testified that he is a K-9 handler and his general duties include traffic law enforcement, criminal interdiction, and training of other K-9 officers. Trooper Browne also described his prior training for identifying behaviors that indicated an individual was involved in criminal activity. These include when an individual changes their driving behavior and certain responses to questions. Trooper Browne was not asked to elaborate on what type of responses would suggest criminal behavior.

{¶ 7} Trooper Browne next testified that he was engaged in traffic law enforcement and drug interdiction on July 9, 2020. On that date, he and Trooper Kyle Mayle, in a separate vehicle, were parked in a crossover on the Ohio Turnpike in Erie County, Ohio. They were observing westbound traffic when Trooper Browne saw a Honda Accord traveling approximately three seconds behind a commercial vehicle in the right-hand lane. He observed that the driver had his hands at the "ten and two" position on the steering wheel, that his hat was tipped upwards, and that he looked "disheveled." Trooper Browne stated that the passenger in the vehicle had his feet on the dashboard and appeared to be sleeping. He testified that it was uncommon for a passenger vehicle to remain in the right lane behind a commercial vehicle rather than looking for an opportunity to pass. He testified that this behavior "drew [his] attention" and he exited the crossover to follow the vehicle. At that time, Trooper Browne believed that he did

4.

not have enough information to determine whether any traffic violation had occurred but noted that appellant was not following too closely during this initial observation.

{¶ 8} Trooper Browne "regained sight of the vehicle" approximately one mile further west along the highway. At that time, he observed the vehicle traveling between "one and one-and-one-half car lengths" behind the commercial vehicle. Trooper Browne then testified that he was familiar with the Ohio Revised Code section prohibiting following a vehicle too closely (R.C. 4511.34) and that a violation of that section warrants initiating a traffic stop for the issuance of a citation. Trooper Browne then described a complex mathematical formula, including a calculation of the distance a vehicle traveling at 67 miles per (his estimate of the vehicle's speed) would travel in one second, to determine that the vehicle was traveling too closely to the commercial vehicle.

{¶ 9} As Trooper Browne approached the vehicle, which was now in a cluster of several vehicles, he observed that the driver of the vehicle slowed down and created space between himself and the commercial vehicle. The passenger was now sitting upright and neither the driver nor the passenger looked in Trooper Browne's direction.

{¶ 10} Trooper Browne was next presented with a copy of the dashboard camera video that recorded the minutes leading up to him initiating a traffic stop of the vehicle. He noted that his vantage point in the driver's seat of his vehicle is different than the dashboard camera's and that he can see "further" and "clearer" than what is recorded by the camera. He did not offer any specific testimony related to his vantage point and how that view would differ from the dashboard camera's point of view. The state then played

5.

the video for the trial court. Trooper Browne described the video and confirmed his belief that the video comported with his testimony describing the incident. Specifically, Trooper Browne testified that the video showed the moment he believed appellant committed a traffic violation had occurred at the 1 minute and 12 second timestamp. The state then introduced a screen shot taken from the dashboard camera video, which Trooper Browne testified showed appellant's vehicle further down the road from the time he had determined appellant had committed the violation. Trooper Browne stated that the screenshot showed appellant's vehicle following too closely and that he had been able to observe appellant in that position "for the last mile." Trooper Browne testified that he initiated the traffic stop of appellant's vehicle for following too closely based on these observations.

{¶ 11} The remainder of Trooper Browne's testimony related to Trooper Mayle's arrival, the K9 search of appellant's vehicle that indicated the presence of drugs, and the subsequent search of the vehicle in which the troopers found a compound containing cocaine, fentanyl, and Tramadol.

### Post-hearing briefs and the trial court's decision

{¶ 12} At the conclusion of the hearing, the trial court granted the parties' request to file post-hearing briefs within two weeks of the hearing. In his brief, filed February 7, 2022, appellant argued that Trooper Browne's testimony showed only that appellant's behavior that led to the stop constituted legal behavior—both hands on the wheel, looking forward—and that Trooper Browne simply had a "hunch" that appellant was engaged in

6.

criminal activity. The state's brief, filed the following day, argued that Trooper Browne's testimony regarding the "totality of the circumstances," including appellant's speed, the visual distance between appellant and the commercial vehicle, and Trooper Browne's calculation of appellant's stopping distance, showed that appellant was following the commercial vehicle too closely in violation of R.C. 4511.34. The state argues that because appellant had committed a traffic offense that Trooper Browne's stop was valid and did not violate appellant's 4th Amendment right to be free from unlawful searches and seizures.

{¶ 13} On February 17, 2022, the trial court entered an order denying appellant's motion to suppress. The court recounted Trooper Browne's testimony regarding appellant's estimated speed, the road conditions, his calculation of appellant's reaction time, his vehicle's braking distance, and the position of other vehicles as evidence that appellant was following too closely. The court found this testimony to be consistent with Trooper Browne's dashboard camera video, making particular note of the screenshot showing appellant's vehicle's position relative to the commercial vehicle just before Trooper Browne initiated the traffic stop. Importantly, the trial court made no reference to Trooper Browne's testimony regarding his vantage point being different than the dashboard camera's, instead relying on its conclusion that Trooper Browne's testimony comported with the video.

7.

**Appellant's trial, the verdict, and sentence**

{¶ 14} On January 27, 2023, the trial court granted the state's motion to amend the first four counts of the indictment to charges of complicity to commit the named offenses. The matter proceeded to trial on January 30, 2023. At trial, the state introduced the compound containing cocaine, fentanyl, and Tramadol that was discovered during the traffic stop. The state also elicited testimony confirming the existence of those drugs within the compound. At the conclusion of the four-day trial, the jury found appellant guilty of complicity to trafficking in cocaine, complicity to possession of cocaine, complicity to trafficking in a fentanyl-related compound, and complicity to possession of a fentanyl-related compound. Appellant was found not guilty of complicity to commit trafficking in drugs, not guilty of complicity to commit possession of drugs, and not guilty of complicity to commit receiving stolen property.

{¶ 15} Appellant appeared for sentencing on March 28, 2023. The trial court imposed an indefinite prison term of 11 to 16 1/2 years for each of the offenses on which the jury found appellant guilty, to be served concurrently. The trial court also imposed a three-year prison term for each of the major drug offender specifications related to those offenses. The sentences on the specifications were ordered to be served concurrently, but consecutive to the underlying prison terms, resulting in an aggregate, indefinite prison term of 14 to 19 1/2 years. Appellant's sentence was memorialized in a judgment entry on March 30, 2023.

8.

## B. Assignments of Error

{¶ 16} Appellant timely appealed and asserts the following error for our review:

1. The trial court erred in entering individual sentences for merged offenses;

2. The imposition of an additional three-year sentence as a result of a major drug offender specification to counts one and two is contrary to law;

3. The court erred in calculating appellant's maximum sentence pursuant to R.C. 2929.144(B)(4) when it utilized the major drug offender specification to add three years to appellant's maximum sentence;

4. The jury verdicts of drug weight and the resulting sentencing enhancements are against the manifest weight of the evidence and violate appellant's Fourteenth Amendment right to due process;

5. The trial court erred in overruling defendant's motion to suppress evidence.

Because it is dispositive of the entire appeal, we address appellant's fifth assignment of error first.

## II. Law and Analysis

{¶ 17} In his fifth assignment of error, appellant argues that the trial court erred in denying his motion to suppress. Specifically, he argues that because Trooper Browne had no reasonable, articulable suspicion of criminal activity necessary to initiate a traffic stop, that any evidence seized during that stop was inadmissible at trial.

### A. *Standard of Review*

{¶ 18} Appellant's motion to suppress was based on alleged violations of his rights under the United States and Ohio Constitutions. "The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution guarantee the right to be free from unreasonable searches and seizures." *State v. Mays,* 2008-Ohio-4539, ¶ 7. "The United States Supreme Court has stated that a traffic stop is constitutionally valid if an officer has a reasonable and articulable suspicion that a motorist has committed, is committing, or is about to commit a crime." *Id.* "[I]f an officer's decision to stop a motorist for a criminal violation, including a traffic violation, is prompted by a reasonable and articulable suspicion considering all the circumstances, then the stop is constitutionally valid." *Id.* at ¶ 8.

{¶ 19} "Appellate review of a Crim.R. 12(C)(3) motion to suppress presents mixed question of law and fact." *State v. Bui*, 2021-Ohio-362, ¶ 29 (6th Dist.), citing *State v. Burnside,* 2003-Ohio-5372, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Burnside* at ¶ 8, citing *State*

*v. Mills,* 62 Ohio St.3d 357, 366, (1992).  "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent credible evidence".  *Id.* at ¶ 8.  "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard."  *Id.* However, an appellate court may reject the trial court's findings when they are not supported by competent, credible evidence.  *Bui* at ¶ 43.  Further, "if an officer's testimony is contradicted by video recorded on a dashboard camera or body camera, an appellate court cannot find that the decision of the trial court was supported by competent and credible evidence."  *Vermillion v. Tedford,* 2020-Ohio-3396, ¶ 5 (6th Dist.), citing *State v. Blasingame*, 2020-Ohio-3087, ¶ 14 (5th Dist.); *State v. Werder*, 2020-Ohio-2865, ¶ 32 (6th Dist.); *State v. Massey*, 2020-Ohio-1206, ¶ 15 (9th Dist.); *State v. Nolen*, 2020-Ohio-118, ¶ 19 (4th Dist.).

{¶ 20} The dissenting opinion does not dispute that this is the applicable standard. However, enmeshed throughout the dissent's analysis is an expanded standard of review that would allow this court to conduct a de novo review of certain pieces of evidence. Noting that there were two sources of evidence at the hearing—Trooper Browne's testimony and the video evidence—the dissent states "[i]f either of them provides competent, credible evidence supporting the trial court's finding that [appellant] was following too closely, then the trial court's decision must be affirmed."  In other words, the dissent concludes that this court only needs to review *either* an officer's testimony *or* the video evidence in order to determine whether a traffic stop was valid, but is not

11.

required to compare the two to determine whether the officer's testimony is consistent with that video. That position is in direct contrast to this court's holding in *Tedford* that mandates the rejection of a trial court's finding that an officer had reasonable, articulable suspicion that a traffic violation occurred when the officer's testimony is inconsistent with the video evidence. *Tedford* at ¶ 5. The dissent does not cite any authority overruling the clear holding in *Tedford*.

{¶ 21} Further, this expanded standard of review advanced by the dissent would create absurd results in which an officer could offer testimony that was entirely inconsistent with the video evidence but allow this court to find, without addressing that inconsistency, that the video evidence alone supported the validity of the stop. More troubling, this expanded standard seemingly allows this court to disregard video evidence showing absolutely no traffic violation but rely on an officer's testimony that such a violation occurred to affirm the validity of a traffic stop. Allowing this court to review testimony and video evidence regarding the same event, without comparing them, essentially allows this court to conduct a de novo review of only the evidence we choose to review in direct contrast to *Tedford*.

{¶ 22} The dissent rationalizes this expanded standard because this court is authorized to affirm a trial court's decision that is "right for the wrong reason," citing *State v. Albright*, 2021-Ohio-292, ¶ 14 (1st Dist.), quoting *In re L.S.*, 2016-Ohio-5582, ¶ 20 (1st Dist.) (additional citations omitted). Moreover, the dissent asserts that "[e]ven if Browne's testimony is not credible, the video evidence still shows [appellant] following

12.

too closely in violation of R.C. 4511.34." Thus, because the dissent finds that the video shows a violation, the trial court's judgment should be affirmed. Being right for the wrong reason would not apply in this instance, however, because *Tedford* requires this court to reject the trial court's conclusion if the dissent had agreed that the testimony is inconsistent with the video. Affirming the trial court's decision in that scenario would require us to ignore *Tedford* and apply the dissent's expanded standard allowing review of the testimony and video independently without ever comparing the two. Since there is no authority allowing this court to consider the video without also considering Trooper Browne's testimony, we decline to apply the dissent's expanded standard and apply the standard of review as described above to the facts of this case.

B. *Trooper Browne's inconsistent testimony mandates our rejection of the trial court's denial of appellant's motion to suppress.*

{¶ 23} Having established the appropriate standard of review, we turn to the merits of appellant's argument. To determine whether the trial court erred in denying appellant's motion to suppress, we review Trooper Browne's testimony and the evidence submitted at the hearing.

{¶ 24} During his testimony, Trooper Browne described his observations of appellant's vehicle as appellant passed the crossover where Trooper Browne was parked. He stated that he initially observed appellant following within two to three car lengths of a commercial vehicle. Importantly, Trooper Browne noted that he did not observe appellant committing a traffic violation by following the commercial vehicle too closely at the time appellant passed him in the crossover. That is, this is not a case in which the

13.

officer observed a violation and it took a few minutes to catch up to the driver before initiating the stop.

{¶ 25} After entering the roadway and regaining sight of appellant, Trooper Browne estimated appellant was traveling 67 miles per hour, and that at that speed, appellant was following the commercial vehicle in front of him too closely. He further testified that he made this determination, in part, based on a complex mathematical equation that allowed him to determine the distance appellant's vehicle traveled per second and his proximity to the commercial vehicle. During his testimony, Trooper Browne identified the time of the dashboard camera video at 1 minute and 12 seconds as the moment he determined appellant had committed a traffic violation. He also described a screen shot of appellant's vehicle, taken from the dashboard camera recording from his vehicle, as occurring approximately one mile after he first observed appellant committing a traffic violation. He testified that he had been able to observe appellant following too closely for that mile and that he could see appellant following too closely at 1 minute and 12 seconds of the video "just as you see this [screenshot]."

{¶ 26} In denying appellant's motion to suppress, the trial court made specific findings of fact regarding the incident. It found that Trooper Browne's testimony was "consistent with the video footage [it] observed." It further found that Trooper Browne's observations were "further borne out by the still photograph of [appellant's] vehicle[.]" Considering Trooper Browne's training, experience, and observations of appellant's vehicle, the trial court found that Trooper Browne had probable cause to believe appellant

14.

was following the commercial vehicle too closely in violation of R.C. 4511.34(A) and denied the motion to suppress. Appellant argues that the video from Trooper Browne's dashboard camera does not support the trial court's factual findings and, as a result, the trial court erred in denying his motion to suppress. We agree.

{¶ 27} As described above, our review of the trial court's denial of appellant's motion to suppress first requires this court to review the trial court's factual findings. *Bui* at ¶ 29. We must defer to the trial court's findings if they are supported by competent, credible evidence. *Id.* However, "if an officer's testimony is contradicted by video recorded on a dashboard camera or body camera, an appellate court cannot find that the decision of the trial court was supported by competent and credible evidence. *Vermillion* at ¶ 5. Having reviewed the record, including the dashboard camera and the still photograph taken from that video, we find that Trooper Browne's testimony is contradicted by the video, precluding us from finding that the trial court's denial of appellant's motion to suppress was supported by competent, credible evidence.

{¶ 28} The video initially comports with Trooper Browne's observation that appellant first drove past him several seconds after a commercial vehicle traveling in the same lane—a distance between the vehicles that Trooper Browne conceded at the hearing did not constitute a violation for following too closely. The video then shows Trooper Browne exit the crossover and pull into a lane of travel to catch up to appellant. It is here that Trooper Browne's testimony significantly deviates from the video evidence.

15.

**{¶ 29}** Trooper Browne testified that he could clearly see that appellant was within one car length of the commercial vehicle ahead of it at 1 minute and 12 seconds as the vehicles traveled under an overpass. At that time, the video reflects the following view:



From that point, appellant's vehicle remains in view for approximately 7 seconds before being obstructed by other traffic. Appellant's vehicle again comes into view at 1 minute and 25 seconds before again being obstructed at 1 minute, 35 seconds. Trooper Browne's view, according to the dashboard video camera, does not move appreciably closer during those times during which appellant's vehicle is in view. Additionally, appellant's vehicle and the commercial vehicle it is following remain partially or fully obstructed from Trooper Browne's view for significant portions of the video from 1 minute, 12 seconds to 1 minute, 50 seconds.

**{¶ 30}** The video shows that Trooper Browne did not regain view—again, an obstructed one—of appellant's vehicle until 1 minute and 50 seconds into the video. At that time, Trooper Browne approached a cluster of traffic that included appellant's

16.

vehicle. The video shows that Trooper Browne is significantly closer at that time, reflecting the following view:



Here, appellant is positioned between a commercial vehicle ahead of him and a commercial vehicle behind him in the far-right lane. A white pickup truck is in the center lane to appellant's left, obstructing a clear view of appellant's vehicle. The following screenshot, introduced at the suppression hearing, was taken from moments later in the video: [2]

---

[2] Although the testimony at the hearing does not provide a specific timestamp for when the screen shot was taken, it is clear that the screen shot was taken during this period as it matches Trooper Browne's testimony of this sequence of events as occurring just after the moment captured in the screenshot.



18.

{¶ 31} Trooper Browne testified that his initial observation of appellant committing a traffic violation at 1 minute and 12 seconds of the video can be seen "just as you see" in the screenshot. He also testified that he could observe appellant in that position for "the last mile." Finally, Trooper Browne testified that appellant did not begin to brake and increase the distance between his vehicle and the commercial vehicle he was following until after the commercial vehicle behind appellant passed him in the center lane.

{¶ 32} We find that Trooper Browne's testimony is contradicted by the video evidence. First, even while giving the trial court the required deference as the trier of fact, it strains credulity to find Trooper Browne's testimony that he could observe appellant's vehicle committing a traffic violation at 1 minute and 12 seconds "just as you see" his vehicle in the screenshot introduced at trial. Trooper Browne's initial distant, partially obstructed view of appellant's vehicle at that point in the video he identifies a violation occurred is in stark contrast to the close-up view of appellant's vehicle provided in the screenshot introduced as Exhibit 4. The contradiction between Trooper Browne's testimony that his distant view and the view in the screenshot, when compared side-by-side, is clear. Additionally, at the point the screenshot was taken, Trooper Browne has already determined that appellant had committed a traffic violation and did not offer any testimony that appellant's position in the screenshot was the basis for his initiation of a traffic stop.

19.

{¶ 33} The dissent find that this testimony does not constitute an inconsistency because, from its review, the distant view from which Trooper Browne determined appellant committed a violation was "well-within the range of a person's ability to see the relationship between two vehicles on the highway." The inconsistency we identified is that the video shows that Trooper Browne's view of appellant at that initial distance simply cannot be "just as you see" appellant's vehicle in Exhibit 4. The trial court's conclusion that Trooper Browne's testimony was consistent with the video, in light of that glaring discrepancy, is precisely why we cannot accept a trial court's ruling when the testimony is inconsistent with the video. The dissent's conclusion only supports its finding that the video shows appellant committing a violation. It does not negate our finding that Trooper Browne's testimony about the nature of those drastically differing views was inconsistent with the video evidence.

{¶ 34} Second, Trooper Browne's testimony that he observed appellant's vehicle following too closely for "a mile" is not supported by the video. We do not dispute that Trooper Browne had an intermittent view of appellant's vehicle during that distance traveled. That view, as described above, was distant and, for the majority of the time described, either partially or fully obstructed. Trooper Browne's testimony, however, stated that he could observe the vehicle in that position for that mile despite other vehicles blocking his view as reflected in the video. While the dissent concludes that Trooper Browne could have determined the position of appellant's vehicle during the times that it was obscured, Trooper Browne did not offer any testimony that his

20.

observation of appellant's vehicle for that mile was based on his ability to deduce appellant's position based on other conditions. He simply stated that he could observe appellant for that mile *without qualification*. Again, it is Trooper Browne's own testimony that reveals an inconsistency with the video on this point. It is not, as the dissent suggests, our demand that the video must show appellant following too closely for that mile that creates that inconsistency. It is for this reason that we find that the testimony Trooper Browne provided as to his observation is directly contradicted by the video evidence.

{¶ 35} Finally, Trooper Browne testified that when he caught up to appellant between two commercial vehicles, appellant did not attempt to brake and increase the distance between his vehicle and the commercial vehicle ahead of him until after the commercial vehicle behind him began to pass. This is simply inconsistent with the video evidence. When appellant's vehicle becomes visible at 1 minute and 50 seconds, its brake lights are illuminated, indicating that appellant is slowing, thereby increasing the distance between himself and the vehicle ahead of him. It is at this point that the commercial vehicle behind appellant moves to pass. Once appellant comes back into view, he has clearly extended the distance between his vehicle and the commercial vehicle ahead of him. The video evidence, again, directly contradicts Trooper Browne's testimony.

{¶ 36} In addition to these visual contradictions, the statements Trooper Browne made on the video are inconsistent with his testimony at trial. Shortly after Trooper

21.

Browne exited the crossover, the dashboard camera video began recording the audio in Trooper Browne's vehicle. At 2 minutes and 41 seconds, just before Trooper Browne initiates the traffic stop, he reports that he had observed appellant following too closely "about two miles ago." As Trooper Browne makes this statement, he passes mile marker 107.1. Two miles prior would have been at approximately mile marker 109.[3] However, at the hearing, Trooper Browne testified that he did not observe appellant following too closely until mile marker 108—the nearest signpost visible in the video to the 1 minute and 12 seconds timestamp—and that appellant remained in that following too closely position for "one mile."

{¶ 37} As noted above, our conclusion that Trooper Browne's testimony conflicts with his conclusion that appellant was following too closely at 1 minute and 12 seconds directly contrasts his statement that he observed appellant following too closely for a "mile."[4] Further, while Trooper Browne's claim that he had observed appellant following too closely "about two miles ago" may have been an estimate, he testified at the hearing that appellant's initial conduct at the crossover while passing mile marker 109 was not illegal and that he did not "regain" sight of appellant for a mile after he entered

---

[3] As the vehicles were traveling westbound, the mile markers appear in descending order.

[4] The dissent finds that Trooper Browne's use of the word "near" while describing the mile marker at which he observed appellant following too closely permits a more generous calculation of the mile he describes. That finding ignores our prior conclusion that Trooper Browne's unqualified testimony that he could observe appellant during that distance is inconsistent with the video evidence showing his view of appellant's vehicle within that mile was obscured.

22.

the roadway. Trooper Browne's statement that he observed appellant following too closely for two miles, then, is not supported by the video, particularly in light of his testimony stating that he did not observe appellant following too closely until nearly a mile later at mile marker 108. The distance Trooper Browne covered prior to initiating the traffic stop does not allow for the duration of his claimed observations. This testimony simply cannot be reconciled with the video evidence and, therefore, undermines the credibility of his testimony.

{¶ 38} As both parties noted, this court has previously addressed the scenario in which a trooper's testimony is inconsistent with the video evidence presented to the trial court. In *State v. Bui,* 2021-Ohio-362 (6th Dist.), we observed that a trooper's testimony regarding the conditions of the road, the offender's vehicle's speed, and the position of other vehicle's impeding the offender's ability to avoid following too closely was inconsistent with the video evidence. *Id* at ¶ 40-42. Specifically, we noted that while the trooper testified that the road conditions were wet and that the vehicle remained too close to the commercial vehicle while the next lane over allowed ample opportunity to pass, the video from the dashboard camera revealed otherwise. *Id.* at ¶ 37. The video showed that the trooper's observation of the defendant's vehicle was obstructed until he was able to catch up to the vehicle. *Id.* Additionally, the defendant remaining in the right lane behind the commercial vehicle was a function of the trooper occupying the passing lane, thereby forcing traffic to remain in the right lane. *Id.* at ¶ 38. Further, the video revealed that the defendant's first opportunity to pass the commercial vehicle was when the

23.

trooper exited the passing lane and pulled behind the defendant. *Id.* We determined that the trooper's testimony, being inconsistent with the video, showed that the trial court's finding that they had a reasonable, articulable suspicion that the offender violated R.C. 4511.34 was not based on competent credible evidence. *Id.* at ¶ 42-43.

{¶ 39} We find this same analysis applicable here. While the number of inconsistencies between the trooper's testimony in *Bui* and the video at issue there exceeds the number of inconsistencies present here, the inconsistencies between Trooper Browne's testimony and the video evidence in the record are nevertheless as significant. The video shows that Trooper Browne had a limited opportunity to observe appellant's vehicle, unobstructed, when he first determined that it was following too closely. However, he testified that his distant, fleeting views of appellant at a distance showed appellant following too closely just the same as the screenshot introduced at trial when he was much closer to appellant's vehicle—a statement that is directly refuted by the video evidence comparing these two views. Further, the statements Trooper Browne made in the video do not comport with his testimony regarding appellant's attempts to increase the distance between himself and the vehicle he was following. Just as in *Bui,* the video shows that appellant's inability to pass the commercial vehicle ahead of him was due to other vehicles occupying the center lane rather than appellant electing to remain behind the commercial vehicle. Finally, Trooper Browne's comments in the video regarding how long he had observed appellant following too closely do not comport with his

24.

testimony that he could observe appellant in that position for a mile. Put simply, the video evidence contradicts Trooper Browne's testimony.

{¶ 40} The dissent criticizes our focus on Trooper Browne's statements that are "ancillary to whether an offense occurred[.]" Citing *Bui,* the dissent charges this court to determine whether the video supports a finding that appellant committed a traffic violation without consideration of these "ancillary" inconsistencies. Again, *Tedford* does not permit that analysis. Additionally, the inconsistencies identified in *Bui*—the officer's description of the position of Bui's vehicle, the camera's obstructed view, Bui's inability to increase his following distance due to traffic in the passing line—are similar to those conditions present here. These conditions are not "ancillary" but are part of the "totality of the circumstances" Trooper Browne testified formed the basis of his conclusion that appellant was following too closely. Since we found that his testimony was inconsistent with the video regarding these conditions, we must find that the trial court erred in denying appellant's motion to suppress. *Tedford* at ¶ 5.

{¶ 41} In sum, we recognize that when ruling on a motion to suppress, the trial court "assumes the role of trier of fact and is in the best position to resolve questions of fact and to assess a witness's credibility. *Bui* at ¶ 29, citing *Burnside,* 2003-Ohio-5372, ¶ 8. We must defer to the trial court's credibility assessment when it is supported by competent, credible evidence. *Burnside* at ¶ 8. However, that deference is not unlimited, and when the trial court's determination is not supported by competent, credible evidence, we may find that the trial court's conclusion was erroneous. *Bui* at ¶ 42.

25.

Further, when the video contradicts an officer's testimony, appellate courts *cannot* find that the decision of the trial court was supported by competent, credible evidence. *Tedford,* 2020-Ohio-3396, at ¶ 5 (emphasis added). We reach that conclusion here. The inconsistencies between Trooper Browne's testimony and the video evidence in the record are such that the video contradicts his testimony. As a result, the trial court's finding that Trooper Browne had a reasonable, articulable suspicion that appellant had violated R.C. 4511.34 is simply not supported by the record.

{¶ 42} We note that Trooper Browne's testimony alone, without any video evidence, could have supported the trial court's decision that there was competent, credible evidence appellant committed a violation. Our finding that the trial court erred, however, is based on our finding that the video contradicts that testimony. Having reached that conclusion, we cannot accept the trial court's determination that there was competent credible evidence that appellant committed a traffic violation. *Id.* Our decision is *Tedford* mandates this conclusion and, importantly, does not suggest that this court can conduct an independent review of the record to determine whether we believe the video or the testimony on their own constitutes competent, credible evidence to support the trial court's decision. As a result, we find that the trial court erred in denying appellant's motion to suppress.

C. *The trial court's error in denying appellant's motion to suppress was prejudicial.*

{¶ 43} Having determined that the trial court erred in denying appellant's motion to suppress, any evidence seized as a result of the illegal stop should have been excluded

26.

as "fruits of the poisonous tree." *Bui* at ¶ 44, citing *Wong Sun v. U.S.,* 371 U.S. 471 (1963). Since appellant's case proceeded to trial after the trial court's erroneous ruling, we must determine whether that error was harmless. *State v. Brown,* 65 Ohio St.3d 483, 485 (1992). An error is not harmless when it affects a substantial right, that is, "the error must have been prejudicial." *State v. Morris,* 2014-Ohio-5052, ¶ 23. Regarding the improper admission of evidence at trial, "a judgment of conviction should not be reversed because of the admission * * * of any evidence offered against * * * the accused unless it affirmatively appears from the record that the accused was or may have been prejudiced thereby." *Id.* at ¶ 27. To find that an error was not harmless, "an appellate court must declare a belief that the error was not harmless beyond a reasonable doubt." *Id.* at 28. "[I]n determining whether a new trial is required or the error is harmless beyond a reasonable doubt, the court must excise the improper evidence from the record and then look at the remaining evidence" to determine whether there is "some other indicia that the error did not contribute to the conviction." *Id.* at ¶ 29.

{¶ 44} Here, because we find that the initial stop was invalid and that all evidence seized from that stop should have been suppressed, our analysis is not complicated. Appellant was convicted for possession of, and complicity to traffic, cocaine and fentanyl. The cocaine and fentanyl introduced as evidence were improperly introduced at trial in violation of appellant's Fourth Amendment rights. The illegally seized evidence clearly contributed to appellant's conviction. Therefore, we find that the trial court's error was prejudicial to appellant and that the error was not harmless beyond a reasonable

27.

doubt. As a result, we find appellant's fifth assignment of error well-taken and we vacate his convictions and remand this matter to the trial court for a new trial. In light of this finding, appellant's remaining assignments of error are moot and, pursuant to App.R. 12(A)(1)(c), we decline to address them.

### III. Conclusion

{¶ 45} We find the appellant's fifth assignment of error well-taken and we reverse the judgment of the Erie County Court of Common Pleas denying appellant's motion to suppress. We, therefore, vacate appellant's convictions and remand this matter to the trial court for a new trial.

{¶ 46} The state is ordered to pay the costs of this appeal pursuant to App.R.24.

Judgment reversed, vacated,
and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J.                         _____
                                                                JUDGE

Myron C. Duhart, J.         
CONCUR.

                                                     _____
                                                                JUDGE

Charles E. Sulek, P.J.       
DISSENTS AND WRITES
SEPARATELY.

**SULEK, P.J., dissenting.**

{¶ 47} Trooper Browne testified that he stopped Lebron-Novas for following a vehicle too closely in violation of R.C. 4511.34(A). Nothing in the video from the dashboard camera contradicts his testimony; rather, the video evidence supports his testimony. Accordingly, because competent, credible evidence exists to support the trial court's finding that Trooper Browne had reasonable and articulable suspicion to believe that Lebron-Novas was following the semi-truck too closely in violation of R.C. 4511.34(A), I dissent.

{¶ 48} As for Lebron-Novas's remaining assignments of error, I would hold that the jury's findings of guilt are not against the manifest weight of the evidence. But because the trial court erred in its imposition of sentence, I would remand the matter for resentencing.

**I. Competent, credible evidence exists to support the trial court's finding of reasonable and articulable suspicion to initiate the traffic stop.**

{¶ 49} I agree with the majority's description of Browne's testimony at the suppression hearing in its recitation of the facts. In my view, however, Browne's testimony does not significantly deviate from the video evidence, but instead aligns with it.

{¶ 50} At 1 minute and 12 seconds on the video, Lebron-Novas's car is visible, traveling closely behind a semi-truck in the right lane of the three-lane highway. Although distant in the video, it is obvious that the space between the car and the semi-truck is much less than the space between any two other vehicles on the highway.

{¶ 51} Lebron-Novas's car can be seen for a full seven seconds until 1 minute and 19 seconds, at which point a passenger vehicle passes it in the middle lane. The car then comes back into view at 1 minute and 25 seconds and is directly visible until 1 minute and 35 seconds, when a pickup truck in the middle lane begins to obstruct the view. During those ten seconds, the car appears to be following very closely behind the semi-truck, consistent with Browne's testimony of approximately one car length.

{¶ 52} As the pickup truck begins to obstruct the view, a second semi-truck can be seen advancing towards the rear of Lebron-Novas's car in the right lane. His car is not directly visible on the video between 1 minute and 35 seconds and 1 minute and 47 seconds. It becomes visible again at 1 minute and 48 seconds and can be seen until 1 minute and 58 seconds. For those ten seconds, the video shows the car traveling between one-half to one car length behind the semi-truck, consistent with Browne's testimony.

{¶ 53} The majority identifies three contradictions between Browne's testimony and the video evidence, and one contradiction between Browne's statement to dispatch and the video evidence. It then concludes that because of those contradictions, this court "cannot accept the trial court's determination that there was competent credible evidence that appellant committed a traffic violation."

{¶ 54} I disagree for three reasons. First, I do not believe there are any contradictions between what Browne said and what the video shows. Second, I believe that even if there are contradictions, they are not meaningful to the issue of determining whether there was reasonable and articulable suspicion to believe that Lebron-Novas was following too closely. Finally, I believe that even if contradictions exist and they are

30.

meaningful, the video in this case showing the traffic violation still provides competent, credible evidence to support the trial court's judgment.

**A. The dash cam video does not contradict Browne's testimony.**

{¶ 55} First, the majority takes issue with Browne's testimony that he could observe Lebron-Novas's vehicle committing a traffic violation at 1 minute and 12 seconds "just as you see" the traffic violation depicted in Exhibit 4, pointing to the contrast between the initial distant, partially obstructed view as compared to the closer nature of the screenshot in Exhibit 4. Browne specifically testified, "As this photograph (Exhibit 4) depicts that half a car length, I can see that for the last mile. In the video I can see it much earlier. They're going underneath an overpass. I can see it just as you see this picture."

{¶ 56} One reading of the majority's decision is that, given the view depicted in the video at 1 minute and 12 seconds, Browne could not have reasonably believed that a traffic violation occurred as early as he said it did.[5] This, however, discounts Browne's testimony describing the difference between the camera and his own view: "I'm sitting on the left side of my vehicle in the driver's seat and my camera is over the right front passenger seat above the dash. The angles are different, and as I'm sitting there, I can see things much further and much clearer than maybe my video camera can do. And depth

---

[5] This interpretation is largely based not on the reasoning provided by the majority in this section of its analysis, but rather on its statement in footnote 4 of its decision referring to "our prior conclusion that Trooper Browne's unqualified testimony that he could observe appellant during that distance is inconsistent with the video evidence showing his view of appellant's vehicle within that mile was obscured."

31.

perception is off on the video camera." Nothing in the record disputes this aspect of Browne's testimony. *See State v. Anderson*, 2013-Ohio-4664, ¶ 20-21 (5th Dist.) ("Trooper Morris confirms he could see Anderson's vehicle and the traffic violations Anderson committed in his vehicle better than that represented on the video recording. The trial judge is in the best position to determine the credibility of witnesses, and his conclusion in this case is supported by competent facts.").

{¶ 57} In addition, as described below, the distance between Browne and Lebron-Novas at the 1 minute and 12 second mark is only approximately two-tenths of a mile. Two-tenths of a mile on a clear, sunny day is well-within the range of a person's ability to see the relationship between two vehicles on the highway. Moreover, even the video, when viewed in a larger scale —as opposed to the smaller image embedded in the majority opinion—shows Lebron-Novas's vehicle following closely behind the semi-truck.

{¶ 58} I, therefore, find no contradiction between his testimony and the video evidence and no reason to disbelieve Browne's statement that he could observe the traffic violation of following too closely at the earlier time.

{¶ 59} A more straightforward reading of the decision, however, uncovers a different "contradiction." The majority states that the inconsistency

> is that the video shows that Trooper Browne's view of appellant at the initial distance simply cannot be 'just as you see' appellant's vehicle in Exhibit 4. . . . The dissent's conclusion only supports its finding that the video shows appellant committing a violation. It does not negate our finding that Trooper Browne's testimony about the nature of those drastically differing views was inconsistent with the video evidence.

32.

The majority's criticism, therefore, is not with Browne's testimony that he was able to see a violation at 1 minute and 12 seconds, but with his testimony that what he saw at that earlier time was exactly the image seen in Exhibit 4. Importantly, the majority does not state that Browne was unable to see a violation at 1 minute and 12 seconds, nor does it criticize my finding that the video shows a violation. Instead, not allowing for the use colloquialisms, the majority focuses on what it describes as the "stark" and "drastically differing views" to conclude that his use of "just as you see" contradicts the video evidence. I do not take Browne's testimony to be literal, but rather understand him to be saying that just as a violation was visible in Exhibit 4, he could see that violation from his vantage at 1 minute and 12 seconds. I, therefore, do not think that Browne's testimony is contradicted by the video evidence. Further, I believe the level of exactitude required by the majority is unreasonable and unnecessary.

{¶ 60} Second, the majority states that the obstructed view for nearly 40 seconds—from 1 minute and 12 seconds on the video until approximately 1 minute and 50 seconds—is inconsistent with Browne's testimony that he observed Lebron-Novas following too closely for "a mile" since the car could not be seen during the entirety of that time. I disagree. The majority acknowledges that during those 40 seconds, Lebron-Novas's car is intermittently visible. But even for those times when it is not directly visible, it is important to recognize that the semi-truck in front of it is still visible, the area behind the car in the right lane is still visible, and the area in front of and behind the vehicles in the middle lane is still visible, such that Browne would know where it was at all times. Furthermore, for the time between 1 minute and 35 seconds and 1 minute and 33.

48 seconds, the second semi-truck in the right lane closes the gap with the first semi-truck enough that Lebron-Novas's car, which is still in the right lane between them, necessarily must be following too closely. Therefore, the video supports, not contradicts, Browne's testimony that he observed the violation for "a mile."

{¶ 61} This, however, does not satisfy the majority. The majority demands that since Browne testified "I can see that for the last mile" without qualification, then his testimony is "directly contradicted" by the video because Lebron-Novas's vehicle was not fully visible for the entire mile. As with the first "contradiction," I do not take Browne's testimony to be that he literally "saw" with his eyes the violation for a mile, but instead understand him to be saying that based on his observations, Lebron-Novas was following too closely for that mile. Thus, I do not find a contradiction between Browne's testimony and the video, and I again think the level of exactitude required by the majority is unreasonable and unnecessary.

{¶ 62} Third, the majority states that Browne's testimony that Lebron-Novas only began to slow after the commercial vehicle behind him moved to pass is directly contradicted by the video showing that he was slowing down as soon as his vehicle was visible at 1 minute and 50 seconds.[6] My view of the video is that it does not appear that the car is slowing down at 1 minute and 50 seconds and it is unclear whether the car had begun braking by approximately 1 minute and 54 seconds, when the second semi-truck signaled to merge into the middle lane to pass it, but by 2 minutes and 6 seconds when

---

[6] In my view, Lebron-Novas's car becomes partially visible at 1 minute 48 seconds, but for ease of reading, I will use the majority's time of 1 minute and 50 seconds.

34.

the car is directly visible again, its brake lights are activated and it is gaining separation from the semi-truck in front of it. Even accepting that the majority's view of the video is correct, however, the result is a "contradiction" only in that Browne testified that Lebron-Novas began braking approximately four seconds later than what the video showed. Specifically, the majority believes the video shows him braking at 1 minute and 50 seconds, and Browne testified that he did not begin braking until the second semi-truck began to pass him at 1 minute and 54 seconds.

{¶ 63} In the context of the video, I think it is reasonable for Browne to use the event of the semi-truck passing as the reference point for when Lebron-Novas began braking since it is the only change in the traffic pattern around that time. I, therefore, do not find a contradiction between Browne's testimony and the video. And, for the third time, I find the level of exactitude required by the majority to be unreasonable and unnecessary.

{¶ 64} Finally, the majority asserts there is an inconsistency with Browne's statements on the video and his testimony at trial. At 2 minutes and 41 seconds, while passing mile marker 107.1, Browne reports to dispatch that he observed Lebron-Novas following too closely "about two miles ago." The majority notes, however, that Browne testified at the hearing that he did not observe Lebron-Novas travelling too closely until mile marker 108. It also notes that Browne testified Lebron-Novas was not following too closely when he first observed him from the crossover at mile marker 109. The majority reasons that this inconsistency cannot be reconciled with the video evidence and therefore undermines the credibility of his testimony.

{¶ 65} Unfortunately, the majority omits the word "near" when describing Browne's testimony. To wit, Browne testified that "I was on the Ohio Turnpike *near* Mile Post 109," and "As I regained sight of the vehicle, it was *near* Mile Post 108." (Emphasis added.)

{¶ 66} Based on the video evidence, Browne's statement to the dispatcher that he observed Lebron-Novas following too closely "about two miles ago" was accurate. Browne pulls out of the crossover just east of mile marker 109.7. Lebron-Novas's car becomes visible in the distance at 1 minute and 12 seconds on the video. At that time, Browne is passing mile marker 108.9 and Lebron-Novas's car is approximately two-tenths of a mile ahead, passing under an overpass near mile marker 108.7. At approximately 1 minute and 52 seconds, roughly when the still image in Exhibit 4 was taken, Browne passes mile marker 108. Lebron-Novas's car did not begin slowing down until sometime between mile marker 107.9 and 107.7. Browne, therefore, observed the car following too closely for approximately 0.8 to 1.0 miles (108.7 minus 107.9 or 107.7), closely corroborating his testimony that he observed Lebron-Novas following too closely for "one mile." Further, when Browne stated to dispatch that he had been following the car for "about two miles" he was at mile marker 107.1, meaning that he had been visibly following Lebron-Novas since mile marker 108.9, or 1.8 miles. Thus, there is no inconsistency between Browne's statements to the dispatcher, his testimony at trial, and the video evidence.

{¶ 67} Furthermore, even if the majority had accurately described the testimony in this portion of its analysis, I would disagree that this constitutes a "contradiction."

36.

Browne used approximations to describe his location and the distance over which he was following Lebron-Novas. As with the others, a contradiction exists only when Browne's testimony is taken literally, and even then, the "contradiction" would be limited to the difference between "one mile" and "about two miles" on the highway. Once again, I believe the level of exactitude required by the majority is unreasonable and unnecessary.

{¶ 68} In all the above, the majority eschews a common sense reading of Browne's testimony in favor of a literal, hyper-technical reading. I believe this is inconsistent with the standard by which we evaluate witness testimony. Indeed, in the related context of search warrant affidavits, courts are cautioned to "conduct a commonsense review . . . not a hypertechnical one." *State v. Long*, 2020-Ohio-4090, ¶ 32 (6th Dist.), citing *State v. Dibble*, 2012-Ohio-4630, ¶ 24. I, therefore, would find that there is no inconsistency between Browne's testimony and the dash cam video, and would hold that the trial court's judgment is supported by competent, credible evidence.

**B. Even if contradictions exist, they are immaterial**

{¶ 69} Even if I accept the majority's literal reading of Browne's testimony, the resulting "contradictions" are immaterial to the focus of the suppression hearing, which is to determine whether Browne had reasonable and articulable suspicion that Lebron-Novas was following too closely in violation of R.C. 4511.34(A).

{¶ 70} The contradictions identified by the majority are: (1) Browne could not literally see the violation at 1 minute and 12 seconds "just as you see" the violation in Exhibit 4; (2) Browne could not literally "see" the violation for one mile because of the traffic obstructing his view; (3) Lebron-Novas began braking at 1 minute and 50 seconds,

37.

four seconds earlier than Browne's testimony that he began braking when the second semi-truck began to pass; and (4) Browne could not have observed Lebron-Novas following too closely "about two miles ago" as he said to dispatch. Nothing in these statements "rises to the level of inventing facts to support a reasonable, articulable suspicion nor undermines [Browne's] credibility to the point that all of his testimony must be disregarded." *State v. Blasingame*, 2020-Ohio-3087, ¶ 14 (5th Dist.).

{¶ 71} Indeed, each of these "contradictions" is ancillary to the question of whether Lebron-Novas was following another vehicle "more closely than is reasonable and prudent, having due regard for the speed of such vehicle . . . and the traffic upon and the condition of the highway." R.C. 4511.34(A). Notably, the majority does not identify or analyze any alleged inconsistencies between Browne's testimony and the video evidence on the relevant factors of the distance between Lebron-Novas's car and the semi-truck, the speed of the vehicles, or the weather and road conditions. Specifically, the majority does not comment on Browne's testimony that Lebron-Novas's vehicle was one-half to one car lengths behind the semi-truck while traveling at approximately 67 miles per hour on the highway.

{¶ 72} Moreover, the majority does not even state that Browne was unable to observe a violation, only that the quality and duration of his observation differed from the testimony he provided. At best, it states that Browne was unable to observe the violation at 1 minute and 12 seconds. But this becomes moot if he observes a violation when he is closer at 1 minute and 50 seconds. As we recognized in *State v. Johnson*, 2023-Ohio-2979, ¶ 27 (6th Dist.), "the degree of violation is irrelevant to our analysis." So long as

38.

Browne provided competent, credible testimony that he was able to observe Lebron-Novas following more closely than is reasonable and prudent under the circumstances—a fact on which the majority does not identify any contradictions between his testimony and the video evidence—then the trial court's finding of reasonable and articulable suspicion to support a traffic stop must be upheld.

**C. Even if the contradictions exist and undermine Browne's credibility, the dash cam video provides competent, credible evidence to support the trial court's judgment.**

{¶ 73} Finally, even if there are contradictions between Browne's testimony and the dash cam video, and even if those contradictions are sufficient to completely undermine Browne's credibility, the dash cam video in this case provides competent, credible evidence to support the trial court's judgment.

{¶ 74} I understand the majority's reasoning to be that because the trial court based its determination of probable cause on Browne's "testimony regarding his training, experience and observations of the driving of the Defendant," and because Browne's testimony is contradicted by the video evidence, then the trial court's decision must be reversed. The majority's reasoning rests on the faulty application of our decisions in *State v. Bui*, 2021-Ohio-362 (6th Dist.), and *Vermilion v. Tedford*, 2020-Ohio-3396, ¶ 7 (6th Dist.).

{¶ 75} In holding that the alleged contradictions preclude this court from finding that the trial court's decision was supported by competent, credible evidence, the majority analogizes the present case to *Bui*. In *Bui*, however, this court recognized that contrary to the officer's testimony, "[n]owhere in the video does it show [Bui's] vehicle proceeding

39.

on the roadway in an unreasonable or unsafe manner, despite following the slower truck, on occasion, at less than the suggested one car length per 10 m.p.h." *Id.* at ¶ 41. The issue in *Bui*, therefore, turned on the fact that this court found that the video did not show a violation. The majority conspicuously makes no such finding here.

{¶ 76} *Tedford* is even less on point. In that case, the dash cam video did not activate until after the officer saw the violation. *Tedford* at ¶ 7. Affirming the denial of the motion to suppress, this court held:

> Upon a review of the evidence, we find the officer testified he observed appellant driving outside the marked lane. Therefore, he had probable cause to make a traffic stop for a violation of Vermilion Codified Ordinance 432.08(a)(1)(A). Because the video recording was started after the officer made his observation of a traffic violation, it does not contradict his testimony. Therefore, we find the trial court's denial of the motion to suppress was based on competent and credible evidence.

*Id.* Thus, *Tedford* stands only for the unobjectionable proposition that where the video begins after the violation had already occurred, it does not contradict the officer's testimony as to the violation, and thus the trial court's finding of reasonable and articulable suspicion to make a traffic stop is supported by competent, credible evidence via the officer's testimony.

{¶ 77} Nonetheless, the majority relies heavily on the statement in *Tedford* that "[i]f an officer's testimony is contradicted by video recorded on a dashboard camera or body camera, an appellate court cannot find that the decision of the trial court was supported by competent and credible evidence." *Tedford* at ¶ 5. That principle was not applied in *Tedford*, but it was in *Bui*.

40.

**{¶ 78}** Unlike *Bui*, however, the dash cam video in this case *shows the violation*. It demonstrates that Lebron-Novas was following too closely as seen in the still shot selected by the majority and Exhibit 4:





{¶ 79} I cannot emphasize enough that the majority does not discuss the merits of whether the elements of the offense were demonstrated based upon the video evidence, particularly where the car is directly visible between 1 minute and 12 seconds and 1 42.

minute and 19 seconds, 1 minute and 25 seconds and 1 minute and 35 seconds, and 1 minute and 48 seconds and 1 minute and 58 seconds.

{¶ 80} Instead, the majority suggests that this court cannot "conduct an independent review of the record to determine whether we believe the video or the testimony on their own constitutes competent, credible evidence to support the trial court's decision." I find this to be a profound and unprecedented statement that cuts against the very role that appellate courts perform in our legal system.

{¶ 81} Here, there are two sources of evidence: Browne's testimony and the dash cam video.[7] If either of them provides competent, credible evidence supporting the trial court's finding that Lebron-Novas was following too closely, then the trial court's decision must be affirmed. *See State v. Burnside*, 2003-Ohio-5372, ¶ 8 ("When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. . . . Consequently, an appellate court *must* accept the trial court's findings of fact if they are supported by competent, credible evidence." (Emphasis added; internal citation omitted.)).

{¶ 82} To be sure, the trial court and this court must consider all the evidence before it. And, as in *Bui*, the video evidence can be useful in determining whether the officer provided credible testimony regarding whether a traffic violation was committed. But it is difficult to envision a scenario in which a trial court's finding of probable cause

[7] Exhibit 4 is simply a screen shot from the video, which itself was entered as Exhibit 3.

43.

to believe that a traffic violation occurred is not supported by competent, credible evidence where the evidence *includes a dash cam video showing that traffic violation.* Yet, that is precisely what the majority holds. The result of the majority's decision is that even where the video shows the violation, if the officer's testimony is contradicted by the video, then the trial court's judgment cannot be supported by competent, credible evidence. This is not the holding of *Tedford*, or any other case in Ohio of which I am aware.

{¶ 83} Furthermore, it does not matter if the trial court ignored the video and erroneously relied solely on Browne's non-credible testimony so long as the video evidence competently and credibly shows the violation. "[T]he trial court can be right for the wrong reasons." *State v. Albright*, 2021-Ohio-292, ¶ 14 (1st Dist.), quoting *In re L.S.*, 2016-Ohio-5582, ¶ 20 (1st Dist.); *see also State v. Maddox*, 2021-Ohio-586, ¶ 13 (10th Dist.), quoting *State v. Lozier*, 2004-Ohio-732, ¶ 46 ("'[a] reviewing court is not authorized to reverse a correct judgment merely because it was reached for the wrong reason'"); *State v. Roberts*, 2016-Ohio-4806, ¶ 23 (7th Dist.); *State v. Granados*, 2014-Ohio-1758, ¶ 39 (5th Dist.); *State v. Warnock*, 2018-Ohio-4481, ¶ 12 (12th Dist.).

{¶ 84} I, therefore, would hold that where video evidence shows a traffic violation was committed, a trial court's finding of reasonable and articulable suspicion to conduct a traffic stop is supported by competent, credible evidence. This is not a novel holding. *See State v. Oliver*, 2023-Ohio-1550, ¶ 69 (10th Dist.) (even if no testimony was elicited from the officer about the defendant's failure to maintain his lane of travel, the cruiser camera video "constitutes evidence in the record from which [a] legitimate inference can

44.

be drawn that there was no apparent reason why it was impracticable for [Mr. Oliver] to remain [in] his lane"); *State v. Yost*, 2018-Ohio-2873, ¶ 18-24 (3d Dist.).

{¶ 85} Recently, in *State v. Johnson*, 2023-Ohio-2979 (6th Dist.), this court upheld the trial court's decision that the officer had reasonable and articulable suspicion to believe that the offender was following too closely in violation of R.C. 4511.34. There, the vehicle was two to three car lengths behind a semi-truck for approximately 55 seconds while traveling approximately 68 miles per hour. *Id.* at ¶ 22. This court held that "although the violation was, in fact, exceptionally slight, the degree of violation is irrelevant to our analysis." *Id.* at ¶ 27.

{¶ 86} If the majority looks at the dash cam video and Exhibit 4 and determines that it does not show Lebron-Novas's vehicle traveling within one to one and one-half car lengths of the semi-truck in front of it, then on that point we can simply disagree. If, however, it is unwilling to make that claim, then any decision to reverse the judgment of the trial court will be based on something other than whether there is competent, credible evidence to support a reasonable suspicion that a traffic offense was committed.

{¶ 87} In sum, the testimony and video evidence described above show that Lebron-Novas was traveling even closer to the semi-truck in front of him than in *Johnson*. I, therefore, would hold that competent, credible evidence exists to support the trial court's finding that Browne had reasonable and articulable suspicion to initiate a traffic stop for following too closely.

45.

**II. The traffic stop was not unreasonably prolonged.**

{¶ 88} As for Lebron-Novas's remaining argument under his fifth assignment of error that was not addressed by the majority, I would hold that the stop was not unreasonably prolonged in order to have the K-9 conduct a free air sniff of the vehicle.

{¶ 89} "A traffic stop may last no longer than is necessary to resolve the issue that led to the original stop, absent some specific and articulable facts that further detention was reasonable." *State v. Jones*, 2010-Ohio-1600, ¶ 35 (6th Dist.), citing *State v. Chatton*, 11 Ohio St.3d 59 (1984). "After a stop is made, officers 'may detain the motorist for a period of time sufficient to run a records check on the driver's license, registration and plates and to issue the driver a citation or warning." *State v. Jones*, 2021-Ohio-2621, ¶ 47 (6th Dist.), quoting *State v. Bordieri*, 2005-Ohio-4727, ¶ 20 (6th Dist.).

{¶ 90} Here, the traffic stop lasted for approximately 9 minutes between when Lebron-Novas stopped his car and when the K-9 alerted to the presence of drugs. During this time, Lebron-Novas produced a learner's permit and additional paperwork from New York, while the passenger produced a Michigan identification card. Neither of them was the registered owner of the vehicle. Browne testified that he ran the vehicle information, researched the learner's permit laws in New York because he was unfamiliar with them and wanted to verify that Lebron-Novas was a legal driver, and requested a criminal history for both occupants. While Browne was conducting these investigatory steps, Trooper Mayle arrived with the K-9 and conducted the free air sniff.

{¶ 91} There is no evidence that Browne delayed or tarried in his investigation to give Mayle time to conduct the free air sniff, and thus the length of the stop did not

46.

violate Lebron-Novas's constitutional rights. *See Jones*, 2021-Ohio-2621, at ¶ 50 (18-minute traffic stop not unreasonable where officer was working on the traffic warning during the entirety of the stop and there is no evidence that he acted in a dilatory manner). Therefore, I would hold that the trial court did not err in denying his motion to suppress, and accordingly would find his fifth assignment of error not well-taken.

### III. The jury's finding regarding weight of the drugs is not against the manifest weight of the evidence.

{¶ 92} In his fourth assignment of error, Lebron-Novas argues that the jury findings that the drugs weighed in excess of 100 grams are against the manifest weight of the evidence.

{¶ 93} "In applying the manifest-weight standard, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury lost its way in resolving conflicts in the evidence, resulting in a manifest miscarriage of justice that necessitates a new trial." *State v. Walker*, 2024-Ohio-5531, ¶ 69 (6th Dist.), quoting *State v. Woods*, 2023-Ohio-3549, ¶ 49 (6th Dist.); *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶ 94} Specifically, Lebron-Novas argues that the lab report indicating the received weight of the drugs as 498.4 grams, "does not set forth the weight of the 'compressed powder block' removed from the outer sealed bag, the inner plastic bag or the plastic wrapping."

{¶ 95} R.C. 2925.51, however, provides that a laboratory report "is prima-facie evidence of the content, identity, and weight or the existence and number of unit dosages

47.

of the substance." Further, Browne testified at the trial that the lab "will remove all packaging, weigh the actual weight of the substance rather than the packaging as well so we can get an accurate weight of it." Browne also identified as a trial exhibit the packaging that had been removed and was separate from the drugs. From this, I would hold that the jury did not lose its way and create a manifest miscarriage of justice when it found that the weight of the drugs exceeded 100 grams.

**IV. The trial court erred in imposing the sentence.**

{¶ 96} Lebron-Novas's first, second, and third assignments challenge the trial court's imposition of sentence. In his first assignment of error, he contends that the trial court erred when it entered individual sentences for merged offenses. In his second assignment of error, he contends the trial court erred in its imposition of major drug offender specifications on Counts One and Two. In his third assignment of error, Lebron-Novas argues that the trial court erred in imposing the major drug offender specification by adding it to the maximum sentence.

{¶ 97} This court reviews felony sentences pursuant to R.C. 2953.08(G)(2), which provides,

> The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:
> (a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;
> (b) That the sentence is otherwise contrary to law.

48.

*State v. Gibson*, 2025-Ohio-309, ¶ 12 (6th Dist.); *State v. Marcum*, 2016-Ohio-1002, ¶ 21.

{¶ 98} During the sentencing hearing, the trial court imposed individual sentences of 11 to 16 1/2 years on Counts One, Two, Three, and Four, but then stated, "Each of those counts either merge or are run concurrent, whichever way you want to look at it." After prompting by the parties, the trial court corrected, "There will be a merger." In its sentencing entry, the trial court again listed individual sentences for each count but then stated in a sentence fragment "said sentences shall merge and shall run concurrently for 11 years to 16 1/2 years." The sentencing entry then imposed individual sentences for the major drug offender specifications. It concluded, however, "The sentences imposed in Count 1, 2, 3, and 4 shall merge and run concurrently for an aggregate term of (11 years to 16 1/2 years). The sentence for the Major Drug Offender Specifications in Counts 1, 2, 3, and 4 shall merge and be served consecutively to the sentences imposed in Count 1, 2, 3, and 4 for a total aggregate sentence of 14 years to 19 1/2 years."

{¶ 99} The State concedes that the trial court should not have imposed concurrent, individual sentences for merged offenses. The State also concedes that additional three-year sentences for major drug offender specifications as to Counts One and Two is contrary to law as an additional term is not provided for under the sentencing statutes. It argues, however, that the trial court did, in fact, merge the convictions at the sentencing hearing, such that any error from the major drug offender specifications as to Counts One

49.

and Two is moot.  Additionally, it argues that instead of a resentencing hearing, the matter should be remanded for the trial court to enter a nunc pro tunc judgment.

{¶ 100} "The imposition of concurrent sentences is not the equivalent of merging allied offenses." *State v. Damron*, 2011-Ohio-2268, ¶ 17.  "[A] trial court must merge the crimes into a single conviction and impose a sentence that is appropriate for the offense chosen for sentencing." *Id.*

{¶ 101} In a roundabout way, the trial court in this case ultimately signaled that the offenses merged, a fact which the parties do not contest.  The trial court, however, failed to identify on which offense the State would like to proceed to sentencing, such that this court cannot determine the count for which sentence was imposed.  Contrary to the State's position, this error cannot be corrected by a nunc pro tunc entry because it is unclear what the trial court actually decided.

{¶ 102} I, therefore, would reverse the trial court's imposition of sentence and would remand the matter for a new sentencing hearing.  As such, I would find Lebron-Novas's first assignment of error well-taken, and his second and third assignments of error not-well taken as moot.

### V. Conclusion

{¶ 103} Because I believe that the video evidence corroborates and confirms Browne's testimony, and as such there was competent, credible evidence that he had a reasonable and articulable suspicion that Lebron-Novas was following too closely in violation of R.C. 4511.34, I would affirm the trial court's judgment denying Lebron-Novas's motion to suppress.  In addition, I would uphold the jury's finding that the drugs

50.

weighed over 100 grams as not against the manifest weight of the evidence.  I, however,

would reverse the trial court's imposition of sentence and would remand for resentencing.

{¶ 104} I respectfully dissent.

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.